316 Ga. 568
FINAL COPY

S23A0032.  BLOCKER v. THE STATE.

COLVIN, Justice.

Appellant Phillip Blocker appeals his convictions for malice murder, participation in criminal street gang activity, and related offenses in connection with the shooting death of Eric Leon Smith.[1]

---

[1] The crimes occurred on April 18, 2010, and Smith died the next day.  In July 2010, a Fulton County grand jury jointly charged Appellant, Chanel Burse, Ralph Gist, Jamainayh Jackson, Qwame Najee, and D'Jhonia Selph with participation in criminal street gang activity through the commission of the enumerated offenses of murder, aggravated assault, and possession of a firearm during the commission of a felony (Count 1), malice murder (Count 2), felony murder (Count 3), aggravated assault with a deadly weapon (Count 5), and possession of a firearm during the commission of a felony (Count 7). Appellant, Burse, Jackson, and Selph were also jointly charged with tampering with evidence (Count 9).  Appellant was separately charged with felony murder (Count 4), interference with government property (Count 6), and possession of a firearm by a convicted felon (Count 8).  A jury trial was held from February 12 to 15, 2013.  Najee and Selph, who had been granted immunity in exchange for their testimony, testified for the State.  Prior to jury deliberations, Count 6 was nolle prossed.  The jury found Appellant not guilty of Count 9 but guilty of all the remaining counts.  The court sentenced Appellant to serve life in prison for Count 2 and imposed consecutive sentences of five years in prison for Count 7, five years in prison for Count 8, and 15 years in prison for Count 1.  The court merged Count 5 with Count 2 for sentencing purposes, and although the court purported to merge the felony murder charges (Counts 3 and 4) into the malice murder charge (Count 2), the felony murder charges were actually vacated by operation of law. See *Moten v. State*, 315 Ga. 31, 31 n.1 (880 SE2d 199) (2022).  Appellant timely filed a motion for new trial on March 6, 2013,

Appellant argues that: (1) insufficient evidence supported his conviction for participating in criminal street gang activity; (2) the trial court abused its discretion in admitting as an excited utterance a hearsay statement that Appellant had just shot someone; and (3) trial counsel was ineffective for (a) failing to object to the State's closing argument that Appellant was guilty of participating in criminal street gang activity, (b) introducing photographic evidence depicting one of Appellant's friends holding a gun and "throwing" possible gang signs, (c) failing to object to the admission of surveillance video capturing events surrounding the shooting, and (d) failing to request a jury charge informing the jury that Appellant's out-of-court statements could not be believed without corroboration. For the reasons that follow, we affirm Appellant's convictions.

1. The trial evidence showed the following. In April 2010,

which he amended through new counsel on December 3, 2018. The trial court held a hearing on the motion for new trial on August 23, 2019, and entered an order denying the motion on April 5, 2022. Appellant timely filed a notice of appeal directed to this Court. The case was docketed to our term of court beginning in December 2022 and submitted for a decision on the briefs.

Appellant had a close, sibling-like relationship with Chanel Burse ("Chanel"), and they called each other "play brother" and "play sister." Chanel lived with Qwame Najee and Najee's girlfriend at an apartment in East Point, Georgia. But on the day of the shooting, Chanel was with her girlfriend, D'Jhonia Selph, and another friend, Jamainayh Jackson, at Selph's apartment in Atlanta, Georgia. That afternoon, Christian Pegues ("Chris"), who was Jackson's boyfriend and one of Chanel's "play brother[s]," came to Selph's apartment with Smith, the victim of the shooting in this case. Smith brought a backpack with him that contained "weed," and Chanel, Selph, and Smith smoked a "blunt" together. Chris and Smith left the apartment about 45 minutes later. After they left, Jackson discovered that some money was missing from the apartment and accused Chris of taking it. Jackson called Chris and "cuss[ed] him out." Although Chris told Jackson he would give the money back, he did not say when, and Jackson wanted to "just go[ ] to see him to get the money."

Meanwhile, Appellant was at Najee's apartment, which was up

the hill from a bus stop at the intersection of Lakemont Drive and Washington Road, where the shooting ultimately occurred.  While at Najee's apartment, Appellant learned about the theft from Chanel and approached Najee to explain that Chanel and Jackson had a problem because Chris had stolen money from them.  Appellant told Najee that Appellant was going to confront Chris and get the money back.

Around 2:00 or 3:00 in the afternoon, Appellant called La'Dawn James, a woman he had recently started dating, and asked James if she had seen Chris or Smith.  According to James, Appellant said he was asking because, "apparently, they stole $500 in rent money from Chanel and he was going to get it back."  Appellant sounded "agitated," and James told him that she had not seen the men.

Later in the day, James went to Najee's apartment.  When she arrived, Appellant, Najee, Najee's girlfriend, and Appellant's friend, Ralph Gist, were present.  According to James, Appellant was "hyped," "mad," and "really, really emotional" about the money "like it was his money . . . that they took."  "His eyebrows w[ere] clinched

4

. . . , his nostrils were flaring, . . . and his face was kind of red," as he "pac[ed] back and forth" and "hit[ ] his hands together," refusing to sit. Although everyone present told Appellant he needed to calm down, he kept saying that he needed to find Chris and Smith, that he needed to get the money back, and that Chris should have had more loyalty to him and Chanel because the three of them had close relationships and considered each other "play brother[s]" and "play sister[s]."

That evening, Gist drove Appellant and Najee from Najee's apartment to a nearby convenience store, which was a short distance from the bus stop where the shooting later occurred. During the drive, Najee saw Gist hand Appellant a .380-caliber handgun. Appellant "tried to cock . . . the gun back multiple times" and then asked Gist how to remove the safety. Gist "pointed to where the safety was and told him to click the safety down."

Meanwhile, Chanel drove Selph's blue GMC Envoy to the convenience store, with Selph and Jackson accompanying her as passengers. On the way, the women passed the bus stop and saw

5

Chris standing there, but they did not stop. When they arrived at the convenience store, Chanel told Najee that Chris had stolen her money and asked if Najee was going to get in Selph's vehicle and go with them to confront Chris. Najee declined, but Appellant took the gun and got into the front passenger seat of the GMC Envoy. Then the group parted ways, with Gist driving Najee back to Najee's apartment, and Chanel driving Appellant, Selph, and Jackson to the bus stop where they had seen Chris.

Chanel drove the GMC Envoy onto the curb in front of the bus stop around 8:45 in the evening. Chris approached the window of the vehicle and spoke to Chanel, who was upset. Meanwhile, Appellant exited the vehicle and approached Smith, who was sitting on a retaining wall next to the bus stop. Witnesses at the bus stop testified that a man matching Appellant's description started arguing with Smith, saying, "Hey, what's up, bro," before telling Smith that "he wanted his money." The witnesses heard another man say "to let it go" or "let that stuff go, it ain't worth it." Then, according to the witnesses, the man matching Appellant's

6

description pointed the handgun at Smith's face, fired a single bullet from "point blank" range, and got back into the front passenger seat of the SUV "like it wasn't nothing." Selph testified that, after entering the vehicle, Appellant said, "He's dead, I shot him in the head," before telling Chanel to drive away, which she did.

Chanel drove Appellant, Selph, and Jackson back to Selph's apartment, where they stayed for the night. At the apartment, Chanel took the gun to the bathroom, where she cleaned it, removed a bullet, and hid the bullet "in between the carpet and the wall." Sometime after the shooting, Najee called Chanel, who told him "that a wannabe Blood was shot."

Gist and Najee returned to Najee's apartment shortly after leaving the convenience store and were not present for the shooting. According to James, who was still at the apartment when the men returned, the men were "bugging" and "kept rubbing their head[s] and kept going like, whew," as they talked about Appellant. A few minutes later, Najee's neighbor knocked on the door and came into the apartment. James observed that the man "looked like he had

7

just c[o]me from the store" because "[h]e had a bag in his hand," and James and Najee both described the man as wide-eyed and breathing heavily. According to James, the man said, "[M]an, your boy tripping, your boy tripping, he just shot somebody down the hill." Najee similarly testified that the man referenced Appellant, who was light-skinned with freckles, saying, "[T]hat albino with the freckles, kid with the freckles just shot somebody."

Officers who responded to the scene of the shooting found that Smith had been shot in the face and was bleeding, but that he was still alive. EMS transported Smith to the hospital, where he died the next day. A medical examiner testified that Smith's cause of death was the gunshot wound to the head and that gunshot residue on Smith's skin indicated that the muzzle of the gun was close when it was discharged.

At the scene of the crime, officers also found a shell casing for a .380-caliber round, a live .380-caliber round, and Smith's backpack, which contained what officers believed were 12 "dime bags" containing "marijuana" and empty plastic bags used for

storing "illegal narcotic[s]." In addition, Detective Shrezad Dunn obtained surveillance footage from a gas station across the street from the bus stop, which was played for the jury. The surveillance footage showed a dark vehicle pull up to the curb by the bus stop, people running away from the bus stop, an unidentifiable person getting into the vehicle, and the vehicle driving away.

A witness to the shooting called 911 and gave the police a partial license-plate number for the shooter's vehicle, which was a match for a blue GMC Envoy registered to Selph. When officers went to the registered address, they discovered that the vehicle was parked in an adjacent parking lot, "[l]ike they were trying to hide it." Prior to the shooting, Selph had moved from the registered address to another apartment in the same complex, leaving her old apartment vacant. Officers briefly encountered Appellant, Selph, Chanel, and Jackson at Selph's new apartment, while inquiring about the now-vacant-apartment's occupant. Selph lied to the officers about who had lived in the vacant apartment, and, when officers learned later that day that Selph had lived there, they

9

returned to the apartment complex. Appellant was no longer present, but officers took the three women to the precinct for questioning.

During interviews with detectives, Chanel stated that Appellant "had killed someone and they were with him at the time," and Selph described the goal of confronting Chris and Smith, saying that "Chanel wanted to obtain weed," Jackson "wanted the money," and Appellant "wanted to obtain one of the bricks," which the detectives understood as a reference to "a kilo of cocaine." Following the interviews, officers searched Gist's apartment, finding a live .380-caliber round in a drawer. They also searched Selph's apartment, finding a live .380-caliber round under the floorboard in the bathroom. Appellant was later arrested at a friend's residence in College Park, Georgia.

Appellant waived his *Miranda*[2] rights and agreed to speak to investigators. Two recorded interviews from April 21, 2010, were played for the jury, during which Appellant told several different

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

versions of events. In the first interview, Appellant admitted that he was present for the shooting but claimed that Chanel was the shooter. Appellant said that "the whole story . . . that was given to me before any of this went down was Chanel had got robbed for some [inaudible], some bricks, and some money." He said that Chanel wanted to kill the thieves and that Chanel got out of the car and shot the victim before they all drove away.

In the second interview, Appellant clarified that Chanel was a member of the Bloods gang and a drug dealer who "work[ed] for somebody" moving "weight," not just "little stuff." He further explained that the shooting was the result of an internal dispute between members of the Bloods, saying:

> Chan is a Blood. The dude that died was a Blood. She told me that she just wanted a gun so she could . . . end her problems. She called me, she said . . . her brother [Chris] and the dude just robbed her. She said, is there any way I could get her a gun? I said, yes. She said, because I put them on [the corner where the bus stop was located to sell drugs] and now they're f**king up my money and stealing from me. . . . The dude that died, he had drugs on him, and Chris, that's what he do[es], he sells drugs.

Appellant denied having any gang affiliation, saying, "I don't have nothing to do with no gang." He claimed that he had "got[ten] dragged into this" situation, that he "was just trying to" help Chanel with "her problem, her business," and that he feared Chanel and her associates "because they . . . know where my family live[s]."

Eventually, Appellant admitted that he had shot Smith and that "[t]he only reason why [he] did it is because [Chanel] said that she was going to pay [him] and that, if [he] didn't do it, . . . [he] was going to die." According to Appellant, Smith was carrying "two bricks, . . . about two pounds of weed, and a lot of money" at the time of the shooting, and Chanel said that if he shot Smith, she would pay him "two stacks," which he understood to mean two thousand dollars. Appellant also said that Chanel threatened that, if he "miss[ed]" or "f**k[ed] this up," she would "put this on Bloods that everything is over with because she kn[e]w where [Appellant was] staying." Appellant told the officers that,

> [a]fter I shot, which I did shoot, I shot, and I got back in the car, Chan took the gun. She said, don't worry about nothing. You not going back to jail. You just did me a

12

big favor. She said, everything going to be good, you going to be paid by next week. I said, all right.

Appellant said that he "d[id not] know who [Chanel] work for, but she work for somebody," and that he feared he would die if he did not shoot Smith.

Appellant then wrote a letter to Smith's family, which was read to the jury and admitted into evidence. Among other things, the letter stated that Appellant was "really and truly sorry for shooting [their] son," that he "was made by drug dealers to do what [he] had done," and that "Chan" told him that, "if [he] did not help her get her money and drugs back" by shooting Smith, "the same would happen to [him] and [his] family."

In addition to hearing Appellant's recorded police interviews, in which Appellant denied that he was a gang member but said that Chanel and the victim were Bloods, the jury heard additional evidence about possible gang affiliations. Najee testified that Appellant "said he was a Crip" and that he had seen Appellant "throw[ ] up" what "looked like the 6-point star" sign associated with

the Crips gang. James was less certain about Appellant's possible gang ties, testifying that she was "not sure" if Appellant was in a gang but that "[m]aybe he is" because "[h]e tried to throw up some gang signs one time" during the week preceding the shooting.

As to Chanel's gang affiliation, Selph testified that Chanel "claimed to be in a Blood gang" and "wore a red bandana." Najee also testified that Chanel "wore a lot of red," carried a red flag or bandana in her right pocket to signify her affiliation with the Bloods, and had relationships with other people who were members of the Bloods, although he believed that Chanel's association with the gang was "[b]asically" a "wanna[be], watered-down version."[3] In addition, through Detective Shawn Buchanan, a detective assigned to the case, defense counsel introduced photos discovered on Appellant's phone, which showed Chanel holding up possible gang signs and holding a handgun. Defense counsel also elicited testimony from Detective Buchanan that officers had found gang paraphernalia

---

[3] Najee testified that he thought it was "very" odd that Appellant and Chanel were friends, given their affiliations with rival gangs.

with Chanel's belongings at Selph's apartment, including "a red flag or scarf . . . which is commonly used by gang members."[4]

2. Appellant contends that the trial evidence was constitutionally insufficient to support his conviction for violating the Georgia Street Gang Terrorism and Prevention Act (the "Gang Act"). See OCGA § 16-15-4 (a). We disagree.

"When evaluating a challenge to the sufficiency of the evidence as a matter of constitutional due process, we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt for the crimes for which he was convicted." *Drennon v. State*, 314 Ga. 854, 861 (3) (880 SE2d 139) (2022). In making that determination, "we put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the jury." *Davis v. State*, 312 Ga. 870, 872-873 (1) (866

---

[4] A stipulation stating that Appellant had been convicted of a felony offense in 2009 was admitted at trial to support Appellant's charge for being a felon in possession of a firearm.

15

SE2d 390) (2021) (citation and punctuation omitted). "As long as there is some competent evidence, even if contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." Id. at 873 (1).

To establish a violation of the Gang Act, the State must prove four elements:

> (1) the existence of a "criminal street gang," defined in OCGA § 16-15-3 (3) as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity"; (2) the defendant's association with the gang; (3) that the defendant committed any of several enumerated criminal offenses, including those "involving violence, possession of a weapon, or use of a weapon"; and (4) that the crime was intended to further the interests of the gang.

*Dunn v. State*, 312 Ga. 471, 474 (1) (863 SE2d 159) (2021) (citation and punctuation omitted). Appellant contends that the State failed to prove the first, second, and fourth elements of the Gang Act charge, arguing that "there was no credible testimony at all th[at] any [person] was in a criminal street gang; that the[ ] gangs were involved in criminal activity; that there was participation in the

16

gangs . . . [or] that the predicate acts were in furtherance of a gang."

We are unpersuaded. See *Charles v. State*, 315 Ga. 651, 653 (2) (884

SE2d 363) (2023) ("On appeal, it is the defendant's burden to show

that the trial evidence was insufficient as a matter of constitutional

due process to support his convictions.").

As to the first element of a Gang Act charge, the trial evidence

authorized a jury finding that the "Bloods" was a gang of three or

more people who engaged in illegal drug trafficking. See *Dunn*, 312

Ga. at 474 (1). Specifically, the jury could have found the existence

of a gang called the "Bloods" based on: Selph's and Najee's

testimony, and Appellant's statements to investigators, that Chanel

was a member of the "Bloods" gang; Selph's and Najee's testimony

that Chanel signaled her affiliation with the gang by wearing a red

bandana; and Detective Buchanan's testimony that officers found "a

red flag or scarf . . . which is commonly used by gang members" with

Chanel's belongings at Selph's apartment. See OCGA § 16-15-3 (3)

(providing that the State may prove the existence of a criminal

street gang "by evidence of a common name or common identifying .

17

. . attire"). The jury also could have found that the Bloods gang comprised three or more people who engaged in illegal drug trafficking because Najee testified that Chanel was associated with other members of the Bloods, Appellant told officers that Chanel and the victim were both Bloods, who worked for unknown associates selling drugs, and Selph told officers that the purpose of confronting Chris and Smith was to recover drugs and money.

The trial evidence also supported the jury's findings as to the second and fourth elements of the Gang Act charge — that Appellant was associated with a gang and that he committed the underlying crimes to further the gang's interests. See *Dunn*, 312 Ga. at 474 (1). A gang association can be established by proof that the defendant was "employed by" a gang or was otherwise "associated with" it. OCGA § 16-15-4 (a) ("It shall be unlawful for any person *employed by* or *associated with* a criminal street gang to conduct or participate in criminal gang activity through the commission of [an enumerated offense]." (emphasis supplied)). Further, a "nexus between the [criminal] act and the intent to further street gang activity . . . can

be established by proof of the defendant's association with a gang and participation in its activities before and during the crimes charged." *Dunn*, 312 Ga. at 474 (1) (citation and punctuation omitted).

Here, although there was conflicting evidence about whether Appellant was in fact a gang member and, if so, which gang he belonged to, the trial evidence authorized a jury finding that Appellant was associated with the Bloods gang and that he committed murder to further the gang's interests. Specifically, the jury was authorized to find that Appellant was "employed by" the Bloods gang to commit a murder for the gang, as Appellant told officers that Chanel offered to pay him a substantial sum of money to help her resolve an internal gang dispute by killing Smith, and that he had agreed to her terms. OCGA § 16-15-4 (a). Alternatively, the jury was authorized to find that Appellant was a member of the Bloods gang who participated in the gang's drug-dealing enterprise and had committed the murder to weed out disloyalty within the gang's ranks based on the combined weight of: James's testimony

19

that Appellant appeared personally outraged that Chris and Smith had stolen the money, "like it was [Appellant's] money . . . that they took"; Najee's testimony that Appellant personally wanted to confront Chris and Smith to recover the money and had obtained a gun for that purpose; Appellant's admissions to police officers that he obtained a gun to help Chanel solve a problem arising from Bloods-related drug dealing; and James's and Najee's testimony that they had seen Appellant "throw" gang signs.[5]

Appellant challenges the credibility of this evidence and points to conflicting evidence in the record, but we cannot make credibility determinations or weigh the evidence when reviewing trial evidence for sufficiency. See *Davis*, 312 Ga. at 872-873 (1). Because there was at least "some competent evidence" supporting the elements of the Gang Act charge that Appellant challenges on appeal, id. at 873 (1) (citation and punctuation omitted), Appellant has failed to show

---

[5] Although Najee testified that the gang sign Appellant flashed was associated with the Crips, rather than the Bloods, the jury was not required to credit that portion of his testimony. See *Clark v. State*, 307 Ga. 537, 541 (1) n.4 (837 SE2d 265) (2019) (noting that a jury is entitled to accept or reject any portion of a witness's testimony).

that "no rational trier of fact could have found [him] guilty beyond a reasonable doubt," *Charles*, 315 Ga. at 654 (2) (citation and punctuation omitted). Accordingly, this claim fails.

3. Appellant argues that the trial court abused its discretion in admitting as an excited utterance hearsay testimony introduced through James. At trial, James testified that Najee and Gist left Najee's apartment with Appellant and returned without Appellant no more than "ten minutes" later. James further testified that "five to ten minutes" after Najee and Gist returned to the apartment, a man "banged on the door . . . real fast" and Najee let him in. When the man entered the residence, James observed that "[h]e had a bag in his hand" and "looked like he had just c[o]me from the store." She also testified that "his eyes were wide" and he was "breathing a little heavy." When the State asked James what the man said, defense counsel objected on hearsay grounds. But the court overruled the objection, ruling that the man's statements were admissible under the excited-utterance exception to the hearsay rule. James then testified that the man said, "[M]an, your boy tripping, your boy

21

tripping, he just shot somebody down the hill."

The excited-utterance exception provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not "excluded by the hearsay rule." OCGA § 24-8-803 (2). "The critical inquiry is whether the declarant is still in a state of excitement resulting from that event when the declaration is made." *Lopez v. State*, 311 Ga. 269, 271 (1) (857 SE2d 467) (2021) (citation and punctuation omitted). In making that determination, a "court should consider the totality of the circumstances." *Varner v. State*, 306 Ga. 726, 732 (2) (b) (ii) (832 SE2d 792) (2019) (citation and punctuation omitted). We review a trial court's admission of a statement as an excited utterance for an abuse of discretion. See *Lopez*, 311 Ga. at 272 (1).

Here, the trial court did not abuse its discretion in admitting James's hearsay testimony as an excited utterance. According to the timeline of events provided by James, the declarant could not have made his statement more than 20 minutes after the shooting.

22

Further, James's testimony that the declarant was wide-eyed and breathing heavily when he entered the apartment, after "bang[ing] on the door . . . real fast," supported a finding that the declarant remained in a state of excitement after observing the shooting. Although Appellant argues that the statement was too remote in time from the shooting to qualify as an excited utterance, we have explained that an "excited utterance need not be made contemporaneously to the startling event," and "the length of time that has passed between the event and the statement" is only one factor to consider in determining whether the declarant was still "under the stress or excitement that the startling event caused." *Sullivan v. State*, 308 Ga. 772, 783 (4) (843 SE2d 411) (2020) (citation and punctuation omitted). Ample evidence supported the trial court's conclusion that the declarant's statement qualified as an excited utterance. See *Lopez*, 311 Ga. at 272 (1) (statements made less than "20 minutes" after the startling event and when the declarant was "visibly shaken" qualified as excited utterances); *Varner*, 306 Ga. at 732 (2) (b) (ii) (declarant's statements made "just

23

minutes after [a] shooting," while the declarant "appeared visibly shaken and panicky," qualified as excited utterances).

4. Appellant also raises four claims of ineffective assistance of counsel. "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." *Hill v. State*, 310 Ga. 180, 187 (3) (b) (850 SE2d 110) (2020) (citation and punctuation omitted). To prevail on an ineffective-assistance-of-counsel claim, a defendant must "prove both deficient performance by counsel and resulting prejudice." *Evans v. State*, 315 Ga. 607, 611 (2) (b) (884 SE2d 334) (2023) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). "To satisfy the deficiency prong, a defendant must demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Taylor v. State*, 315 Ga. 630, 647 (5) (b) (884 SE2d 346) (2023) (citation and punctuation omitted). "The law recognizes a strong presumption that counsel performed

reasonably, and the defendant bears the burden of overcoming this presumption." *Evans*, 315 Ga. at 611 (2) (b) (citation and punctuation omitted). "To carry this burden, [a defendant] must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not," and "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Bates v. State*, 313 Ga. 57, 62 (2) (867 SE2d 140) (2022) (citation and punctuation omitted). "To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Taylor*, 315 Ga. at 647 (5) (b). If a defendant fails to carry his burden of proving either deficient performance or prejudice, we need not address the other prong of the *Strickland* test. See id.

(a) Appellant argues that his trial counsel performed deficiently by failing to object to the prosecutor's closing argument

25

that Appellant was guilty of the Gang Act charge because "there was only slight if not completely insufficient evidence admitted of a possible gang affiliation" and the prosecutor addressed "matters which were not in evidence." In particular, Appellant contends that trial counsel should have objected to the following remarks by the prosecutor:

> I submit to you that . . . if you believe the defendant's story that Chanel is a Blood, that at some point you believe his story about this drug ring that was going on, this whole dispute was about drugs and that Chanel put [Smith] and Chris on to sell drugs there on the corner, that this dispute was about bricks of cocaine and weed, and that ultimately he confessed that they had been stealing — not only stolen money at the house but they had been messing up her drug money and as a result she wanted to enlist his help and pay him to kill somebody, that he was going to receive two stacks, and his phone, arrested has pictures of Chanel with bandanas, by the defendant's own admission to the fact that he is dealing with a Blood, the fact that he agrees to do what this Blood has asked him to do, his own admission is that he has associated with a criminal street gang during commission of this offense. And I submit to you that he is guilty of the criminal street gang act and that's why we've charged him.

At the motion-for-new-trial hearing, trial counsel testified that he did not object to these closing arguments in part because he

26

"viewed the prosecutor's comments as a reasonable inference from the evidence that was presented." The trial court credited trial counsel's testimony and further found that the statements at issue were in fact reasonable inferences from the trial evidence. Accordingly, the trial court concluded that trial counsel's failure to object could not have been deficient performance.

The trial court did not err in denying Appellant's motion for new trial on this ground, as Appellant failed to show that the prosecutor's Gang Act arguments lacked an evidentiary basis and therefore did not establish that trial counsel's failure to object was objectively unreasonable. See *Arnold v. State*, 309 Ga. 573, 577 (2) (a) (847 SE2d 358) (2020) (holding that counsel did not perform deficiently by failing to object to a portion of closing arguments for which "there was an evidentiary basis"). First, contrary to Appellant's argument, it was not "highly improper" for the prosecutor to argue that Appellant was guilty of the Gang Act charge, as we ruled in Division 2 above that the trial evidence was sufficient to support that charge. Second, most of the prosecutor's

remarks about the Gang Act charge did not require any inferences from the evidence but were instead straightforward descriptions of Appellant's own statements to police officers, including that Chanel was a member of the Bloods gang who stationed Chris and Smith on the corner to sell drugs, that Chanel wanted to recover "bricks," "weed," and money from Chris and Smith because they had stolen money from her, and that Appellant accepted Chanel's offer to pay him "two stacks" to kill Smith. Finally, Appellant's contention that there was no evidentiary basis for the prosecutor's argument that Chris and Smith "had been messing up [Chanel's] drug money" fails because it was reasonable to infer that the money Chris and Smith stole was drug money based on Appellant's statements to investigators indicating that Chanel was a major drug dealer. See *Ridley v. State*, 315 Ga. 452, 459 (4) (b) (883 SE2d 357) (2023) (noting that prosecutors are afforded "wide latitude . . . to draw reasonable inferences from the evidence" when making a closing argument); *Varner v. State*, 285 Ga. 300, 301 (2) (c) (676 SE2d 189) (2009) (same).

Because Appellant has not shown that the prosecution's closing argument was objectionable, and because "trial counsel's failure to make a meritless objection to the State's closing argument is not evidence of ineffective assistance," Appellant has failed to establish deficient performance on this ground. *Arnold*, 309 Ga. at 577 (2) (a) (citation and punctuation omitted).

(b) Appellant contends that trial counsel was ineffective for introducing into evidence photographs from Appellant's cell phone showing Chanel "throwing" possible gang signs and holding a handgun. At the motion-for-new-trial hearing, trial counsel testified that the gang evidence and Appellant's admission to police officers that he had shot the victim constrained his ability to develop a "plausible" defense. Trial counsel said that, as a result, he decided to "run with" the gang evidence and argue that Appellant's actions were coerced by Chanel, who had gang connections. He further said that the "goal" of introducing photographs of Chanel was "to make it clear that Chanel Burse was a gang member." Trial counsel acknowledged that "duress or coercion [wa]s not a defense to

29

homicide" and testified that, for this reason, he "was going to focus [the coercion argument] primarily on the felony murder aspect of [the case], arguing that the underlying felony was coerced . . . , and then argue there was no malice or malice murder."

Appellant contends that the trial court erred in denying this ineffective-assistance-of-counsel claim, arguing that trial counsel's decision to introduce the photographs of Chanel was an unreasonable trial strategy because the photos "only contributed to the State's [Gang Act] case" and failed to corroborate a coercion defense. We disagree.

Appellant has not shown that trial counsel's trial strategy was "so patently unreasonable that no competent attorney would have followed such a course." *Bates*, 313 Ga. at 62 (2) (citation and punctuation omitted). As we have previously noted, "whether trial counsel's actions are reasonable may be determined or substantially influenced by a defendant's own statements." *Lambert v. State*, 287 Ga. 774, 776 (2) (700 SE2d 354) (2010). Here, Appellant's admissions to investigators that Chanel was a Bloods gang member

and that he had committed the fatal shooting at Chanel's direction constrained trial counsel's ability to develop a defense theory. Moreover, Appellant has not identified any viable, alternative defense theory that trial counsel might have pursued. Under these circumstances, we cannot say that trial counsel performed deficiently by introducing additional evidence that Chanel was a gang member to support a coercion defense to the non-murder charges, while also arguing that Appellant lacked the necessary intent to commit malice murder. See id. at 776-777 (2) (holding that, even though "coercion is not a legal defense to murder," trial counsel did not perform deficiently in advancing a coercion defense because "defense counsel was constrained by [the defendant's] admissions to police that he had committed the fatal beating," the defendant had "fail[ed] to even suggest any defense theory that trial counsel should or could have advanced," and defense counsel had "attempted to highlight and exploit any possible weaknesses in the State's case").

(c) Appellant argues that trial counsel performed deficiently by failing to object to the admission of surveillance video, which

31

captured events surrounding the shooting, on the ground that the State had not properly authenticated the footage. At trial, Detective Dunn testified that she had obtained the surveillance footage from a gas station across the street from the bus stop, but the State did not offer any other witness to authenticate the video. At the motion-for-new-trial hearing, trial counsel testified that he did not object to the surveillance video because, among other things, the video captured events "from a fair distance away from the scene of the killing," and the video was consistent with the defense theory, which did not dispute that Appellant was the shooter.

Appellant has not shown that trial counsel's failure to object to the admission of the surveillance video was "objectively unreasonable." *Taylor*, 315 Ga. at 647 (5) (b) (citation and punctuation omitted). Appellant contends that trial counsel could have excluded the video if he had objected, but that argument does not address why "no competent attorney" would have chosen not to object. *Bates*, 313 Ga. at 62 (2) (citation and punctuation omitted). Appellant makes no effort to explain why it was unreasonable for

32

trial counsel to conclude that the video was consistent with the defense theory and would not harm the defense, and, thus, that objecting was unnecessary. Accordingly, Appellant has not carried his burden to overcome the "strong presumption that counsel performed reasonably" in deciding not to object to the admission of the surveillance video. *Evans*, 315 Ga. at 611 (2) (b) (citation and punctuation omitted).

(d) Appellant argues that trial counsel was ineffective for failing to request a jury charge stating that "[t]he defendant's out-of-court statement, unsupported by any other evidence, . . . even if believed, is not sufficient to justify conviction." See OCGA § 24-8-823 ("All admissions shall be scanned with care, and confessions of guilt shall be received with great caution. A confession alone, uncorroborated by any other evidence, shall not justify a conviction."). At trial, the court noted that such a charge was optional and asked if trial counsel wanted the court to give it. Trial counsel declined the offer. At the motion-for-new-trial hearing, trial counsel testified that he did not request the corroboration charge

33

because he "fe[lt] like there was corroboration," he "didn't feel as though [arguing lack of corroboration] would be a viable defense," and he "simply thought [the charge] would be confusing to the jury" because he "was telling the jury . . . to believe [Appellant's] statement in full" as part of a coercion defense. Based on this testimony, the trial court concluded that Appellant had shown neither deficient performance nor prejudice.

On appeal, Appellant asserts that "[i]t is in [the] purview of the jury to decide if the confession . . . is corroborated by other admissible evidence" and that "no competent attorney would reject [a corroboration] charge as it benefits his own client." But even assuming that Appellant's statements constituted "confessions" rather than "admissions" and therefore required corroboration, we are unpersuaded that counsel performed deficiently in failing to request a corroboration charge. See *Hooper v. State*, 313 Ga. 451, 455-456 (1) (870 SE2d 391) (2022) (assuming that an appellant's statements were confessions for purposes of analyzing a claim that trial counsel was ineffective for failing to request a corroboration

34

jury charge).  See also *McMullen v. State*, 300 Ga. 173, 174 (1) (794 SE2d 118) (2016) ("An admission differs from a confession in that a confession acknowledges all of the essential elements of the crime." (citation and punctuation omitted)).

Appellant does not explain why it was objectively unreasonable for trial counsel to conclude that Appellant's statements were adequately corroborated and therefore that a corroboration charge would not aid in the defense.  Notably, the record supports trial counsel's conclusion, as "several particulars" of Appellant's statements "were corroborated" by other trial evidence.  *Hooper*, 313 Ga. at 456 (1) (holding that the "evidence was sufficient to corroborate [the appellant's] confessions under the applicable standard").  For example, Selph's testimony that Appellant was the shooter, and eyewitness testimony that a man matching Appellant's description shot the victim, corroborated Appellant's admission that he had shot Smith.  Likewise, Appellant's admission that he shot Smith in an effort to help Chanel recover money and drugs was corroborated by Najee's and James's testimony that Appellant said

he was going to confront the men to recover Chanel's money and by Selph's statements to officers that the goal of confronting Chris and Smith was to recover drugs and money.

Nor has Appellant explained why it was unreasonable for trial counsel to conclude that he would confuse the jury by arguing, on the one hand, that jurors should not believe Appellant's statements because they were inadequately corroborated, and, on the other hand, that jurors should believe Appellant's conduct was coerced based on those same statements. Given trial counsel's theory of the defense and the fact that sufficient trial evidence corroborated Appellant's statements, we cannot say that trial counsel adopted a "patently unreasonable" trial strategy in forgoing a corroboration charge. *Bates*, 313 Ga. at 62 (2) (citation and punctuation omitted).

5. Finally, Appellant asserts a cumulative-error claim. "Under *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020), we must consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel." *Talley v. State*, 314 Ga. 153, 165-166 (4) (875 SE2d 789)

(2022) (citation and punctuation omitted). However, as explained above, Appellant has failed to establish any trial court errors or instances in which trial counsel was professionally deficient. Accordingly, "there are no errors to aggregate, and his claim of cumulative error also fails." *O'Neal v. State*, 316 Ga. 264, 271 (6) (__ SE2d __) (2023).

*Judgment affirmed. All the Justices concur, except LaGrua, J., disqualified.*

Decided June 21, 2023.

Murder. Fulton Superior Court. Before Judge Brasher.

*Kempter Law Group, Christina M. Kempter*, for appellant.

*Fani T. Willis, District Attorney, Michael S. Carlson, Kevin C. Armstrong, Burke O. Doherty, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth H. Brock, Assistant Attorney General*, for appellee.