321 Ga. 299
FINAL COPY

S25A0271. ROSENAU v. THE STATE.

COLVIN, Justice.

Appellant Frederick Marsalia Rosenau appeals his convictions for felony murder and a violation of the Street Gang Terrorism and Prevention Act ("Gang Act") in connection with the shooting death of Quincy Suggs.[1] On appeal, Rosenau argues that the trial evidence

---

[1] Suggs was shot and killed on September 16, 2014. On October 21, 2015, a Clayton County grand jury jointly charged Rosenau, Lavarr Pierce, Khadijah Jenkins, and Julius Lofton with malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), arson in the first degree (Count 4), and violations of the Gang Act predicated on aggravated assault and arson in the first degree (Counts 5 and 6, respectively). Pursuant to a negotiated plea agreement, Lofton pled guilty to voluntary manslaughter as a lesser offense of malice murder and testified against the other co-defendants at their trial.

Rosenau, Pierce, and Jenkins were jointly tried before a jury from November 13 through 27, 2017. The jury found Rosenau guilty of Counts 2, 3, and 5 and not guilty of Counts 1, 4, and 6, Pierce guilty of Counts 1 through 5 and not guilty of Count 6, and Jenkins guilty of Counts 3 and 5 and not guilty of Counts 1, 2, 4, and 6. The trial court sentenced Rosenau to life in prison without the possibility of parole for felony murder (Count 2) and imposed a consecutive, 15-year prison term for the Gang Act violation (Count 5). The court merged the aggravated-assault charge (Count 3) with the felony-murder conviction for sentencing purposes. Rosenau filed a timely motion for new trial on December 13, 2017, and amended the motion through new counsel on February 17, 2020. The trial court denied the motion, as amended, on August 29, 2024. Rosenau filed a timely notice of appeal and amended notice of appeal

was insufficient to support his Gang Act conviction and that the trial court erred in denying his motion for mistrial after the prosecutor commented on his silence. He also argues that his trial counsel was constitutionally ineffective for failing to retain a gang expert and for not objecting to testimony about a robbery that did not involve any of the co-defendants. As explained below, Rosenau's claims fail, so we affirm his convictions.

1. In *Pierce v. State*, 319 Ga. 846 (907 SE2d 281) (2024), we recounted the evidence presented at the joint jury trial of Rosenau and his co-defendants, Lavarr Pierce and Khadijah Jenkins, as follows:

> This case arises from the killing of a "john" during his visit to a house occupied by prostitutes and high-ranking gang members. The trial evidence showed the following. The State's gang expert, Sergeant Brandon McKay, testified that the Luxiano gang was a set of the Nine Trey Bloods gang. He said that the gangs had a rank structure, that Frederick Rosenau had "a very high rank" in the Nine Trey Bloods with authority over the Luxiano set, and that Julius Lofton, who started the Luxiano set, and [Pierce] were both highly ranked members of the Luxiano set. He further testified that the Nine Trey

directed to this Court. The appeal was docketed to this Court's term beginning in December 2024 and submitted for a decision on the briefs.

2

Bloods and the Luxiano set wore red clothing and used specific hand signs to signal their gang affiliation. . . .

Sergeant McKay testified that he had arrested Luxiano gang members for many types of violent crimes, including armed robberies. He said that members could get promoted within the gang by committing armed robberies, and that the proceeds from armed robberies went toward members' monthly gang dues. He also said that prostitution was one of the primary ways the Luxiano made money, that almost every female associated with the group engaged in prostitution, and that members of the gang would sometimes use prostitutes to lure victims to a location where gang members could rob or carjack them.

Consistent with Sergeant McKay's testimony, Lofton testified that he had started the Luxiano gang as a set of the Nine Trey Bloods, and that the Luxiano set had approximately 80 members at its peak. Lofton said that Rosenau was the "low," meaning Rosenau was a Nine Trey Bloods member with a higher rank than Lofton within the Nine Trey Bloods. Lofton further testified that he was the "fourth floor," the highest ranked leader of the Luxiano set, and that [Pierce] and his brother were lower ranked Luxiano members, with [Pierce's] brother "unofficially" being the "third floor" and [Pierce] being the "second floor." Lofton said that Briana Davis was the mother of his child, and that she worked for him as a prostitute. Lofton also identified Jenkins as a Luxiano member who dated Rosenau. And while Tequila Forehand, another Nine Trey Bloods member, hesitated when asked if Jenkins worked for Rosenau as a prostitute, she testified that Jenkins would "do anything [Rosenau] asked her to" and that she had seen Jenkins give money to Rosenau on more than one occasion.

Lofton testified that he was aware that Luxiano

gang members were robbing men who came to see female gang members engaged in prostitution, and that Luxiano members paid him monthly dues, which were turned over to higher ranking Nine Trey gang members. Lofton further testified that he witnessed "the end part" of one such robbery incident, in which two Luxiano members known as "Jabo" and "Man-Man" robbed a man who had visited an apartment to purchase sex from a female Luxiano known as "Jippy." The robbery victim in that incident testified that he had paid Jippy for sex on one occasion, and that, when he visited her a second time, two men robbed him at gunpoint.

As specifically relevant to the killing of Suggs, Lofton and Davis each testified that they were staying at Jenkins's mother's house with Rosenau and Jenkins for a period of time in September 2014, and that during that period Davis engaged in prostitution and gave the money she earned to Lofton. Davis testified that Jenkins was also engaging in prostitution in the house, and that Jenkins's earnings went to Rosenau.

Lofton testified that, on the night before Suggs's death, [Pierce] came to the house and talked to Lofton in Rosenau's presence about robbing the "johns" coming to the house for sex. According to Lofton, he told [Pierce] that he "didn't care if . . . it went on," and Rosenau did not say anything. Lofton testified that, after the conversation, he went to sleep.

Davis testified that she had advertised her services online and that Suggs had responded to her advertisement via text message, asking to spend some time with her. They agreed to meet up, and, on the morning of September 16, 2014, Suggs visited Jenkins's mother's house, had sex with Davis, paid her, and then left. Davis said that, later that morning, Suggs called her because he wanted to come back "to chill," and she invited

4

him to come back with "[s]ome weed." In the meantime, Davis testified, [Pierce] arrived at Jenkins's mother's house and went inside.

According to Davis, when Suggs arrived the second time, Rosenau, Lofton, and Jenkins were asleep, and [Pierce] was the only other person awake in the house. Davis testified that she went outside to meet Suggs at his car, and Suggs asked to use the bathroom in the house, which she gave him permission to do. Davis said that, a few minutes after Suggs went inside the house, she heard a gunshot.

Lofton also heard a gunshot, testifying that he "woke up to a gunshot" and then ran out of the bedroom to see [Pierce] standing with a gun in his hand "[r]ight next to" Suggs's dead body, which was lying face down on the floor near "a lot" of $20 bills. According to Davis, following the gunshot, [Pierce] came outside holding a handgun, followed by Rosenau, Jenkins, and Lofton. Davis testified that [Pierce] gave the gun to Rosenau. And according to both Davis and Lofton, [Pierce] then drove away in his own car while the rest of the group drove away in another car.

Lofton said that they drove to his brother's apartment. Davis testified that, during the car ride, Rosenau said that [Pierce] killed Suggs. [According to Forehand, however, Rosenau later told her "he had shot [a] man in the back of the head" while inside Jenkins's mother's house.] According to Lofton, [Pierce] came over to the apartment later that day, asked Lofton if Lofton thought Jenkins and Davis were going to say anything about the shooting, and told Lofton that "[i]t was taken care of" and "we was going to be good." When asked about efforts to conceal the crime, Forehand testified that Rosenau later told her that "the house was burnt down." [Forehand further testified that Rosenau knew Jenkins

5

planned to talk to the police and that he told Forehand to "kill [Jenkins] if his name came up" in connection with the shooting.] And Lofton testified that he had pled guilty to voluntary manslaughter in the case because his "gang related" "actions led up to the death of [Suggs]."

At some point during the day of Suggs's shooting, police officers and firefighters were dispatched to Jenkins's mother's house, where they discovered that the house was on fire and producing thick black smoke. Firefighters entered the burning house to search for victims and found Suggs's dead body lying in the den area.

Based on Suggs's injuries and the absence of soot in his airways, a medical examiner concluded that Suggs had died before the fire started from a single gunshot wound to the back of his neck that was fired from "less than half an inch away" and that injured his spine and fractured his jaw. And an arson investigation revealed both that an accelerant had been used in the house and that the fire had three separate points of origin.

*Pierce*, 319 Ga. at 847-849 (1) & nn.4-5 (footnotes omitted).

2. Rosenau argues that the trial court erred in denying his motion for a directed verdict on the Gang Act charge, which was predicated on the aggravated assault of Suggs with a deadly weapon, because the trial evidence was constitutionally insufficient to support his conviction on that count. We disagree.

"The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of

6

the evidence to support a conviction." *Clements v. State*, 317 Ga. 772, 783 (1) (896 SE2d 549) (2023) (citation and punctuation omitted). When assessing the sufficiency of the evidence as a matter of constitutional due process,

> we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt for the crimes for which he was convicted. In making that determination, we put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the jury. As long as there is some competent evidence, even if contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

*Blocker v. State*, 316 Ga. 568, 574 (2) (889 SE2d 824) (2023) (citations and punctuation omitted).

The Gang Act makes it "unlawful for any person . . . associated with a criminal street gang to . . . participate in criminal gang activity through the commission of" certain enumerated offenses. OCGA § 16-15-4 (a). To establish a violation of OCGA § 16-15-4 (a), the State is required to prove four elements:

(1) the existence of a "criminal street gang," defined in

7

OCGA § 16-15-3 (3) as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity"; (2) the defendant's association with the gang; (3) that the defendant committed any of several enumerated criminal offenses, including those "involving violence, possession of a weapon, or use of a weapon"; and (4) that the crime was intended to further the interests of the gang.

*Rooks v. State*, 317 Ga. 743, 753 (2) (893 SE2d 899) (2023) (citation and punctuation omitted).

Here, the trial evidence was constitutionally sufficient to prove each of these elements. As an initial matter, we already held in *Pierce* that sufficient evidence was introduced at Rosenau's joint trial to establish the first and fourth elements of the Gang Act charge. See *Pierce*, 319 Ga. at 851-852 (2) (holding that "ample trial evidence showed the existence of a criminal street gang" called "the Luxiano," and that "the jury was authorized to find that the aggravated assault [of Suggs] was intended to further the gang's interests").

As to the second element of the Gang Act charge, sufficient trial evidence showed that Rosenau was associated with the Luxiano

8

gang, even though he was not a Luxiano member. Specifically, the evidence supported an inference that Rosenau had an official association with the Luxiano gang because Sergeant McKay testified that Rosenau had a high rank in the Nine Trey Bloods with authority over the Luxiano gang, and Lofton likewise testified that Rosenau outranked him in the Nine Trey Bloods gang of which the Luxiano gang was a subset. See *Pierce*, 319 Ga. at 847 (1). Further, the jury was authorized to conclude that Rosenau was associated with the Luxiano gang based on his active participation in the Luxiano gang's prostitution business. Specifically, Sergeant McKay testified that "prostitution was one of the primary ways the Luxiano made money," and testimony from Lofton, Davis, and Forehand indicated that Rosenau was profiting from the prostitution engaged in by his Luxiano girlfriend, Jenkins. Id. at 847-848 (1). Accordingly, the trial evidence was sufficient to prove that Rosenau was associated with the Luxiano gang. See *Blocker*, 316 Ga. at 576 (2) (holding that there was sufficient evidence that the defendant was "associated with" the gang even if he was not a gang member).

Finally, as to the third element of the Gang Act charge, the trial evidence was sufficient to show that Rosenau committed the aggravated assault with a deadly weapon of Suggs, which we have held qualifies as an enumerated offense under the Gang Act. See *Pierce*, 319 Ga. at 852 (2). Because Forehand testified that Rosenau admitted to her that he personally "'shot [a] man in the back of the head' while inside Jenkins's mother's house," the jury was authorized to find that Rosenau directly committed the aggravated assault of Suggs. Id. at 849 (1) n.4. See OCGA § 16-2-20 (providing that "[a] person is concerned in the commission of a crime" if he "[d]irectly commits the crime").

But even if Pierce, rather than Rosenau, was the shooter, the trial evidence authorized a finding that Rosenau was a party to Suggs's aggravated assault. "It is well established that a person who does not directly commit a crime may be convicted upon proof that the crime was committed and that person was a party to it." *Clark v. State*, 315 Ga. 423, 427 (2) (883 SE2d 317) (2023) (citation and punctuation omitted). To establish that a defendant was a party to

10

a crime, the State must prove "a common criminal intent, which the jury may infer from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes." Id. Here, we have already held that the trial evidence supported a finding that Pierce committed an aggravated assault on Suggs by shooting him. See *Pierce*, 319 Ga. at 852 (2). And the jury could reasonably infer that Rosenau shared Pierce's criminal intent from Lofton's testimony that Rosenau was present for a conversation about robbing the "johns" coming to the house, which occurred on the night before the shooting; Davis's testimony that, immediately after the shooting, Pierce gave the gun to Rosenau; Davis's testimony that Rosenau fled the scene with the other co-defendants; and Forehand's testimony that Rosenau instructed her to kill Jenkins if Jenkins brought up Rosenau's name when talking to the police. See id. at 848-849 (1) & n.5. See also *Broxton v. State*, 306 Ga. 127, 137 (4) (829 SE2d 333) (2019) ("The evidence was sufficient to authorize [the appellant's] conviction as a party to the malice murder of Nelson and the aggravated assault of Turner, as well as

11

the counts of violation of the Street Gang Act predicated on those crimes," based on evidence showing that the appellant and his companions were seeking to shoot certain people "green-lit" by the gang, that the appellant was present for the shootings, and that the appellant fled the scene); *McGruder v. State*, 303 Ga. 588, 591, 593 (II) (814 SE2d 293) (2018) (holding that the evidence was sufficient to authorize a jury finding that the defendant committed a "predicate crime for criminal street gang activity" as a party to the crime of aggravated assault and murder, where the evidence showed, among other things, that the defendant heard fellow gang members say in advance "that they were going to 'get' the Wren Boys" and that the defendant fled the scene with the shooter). Accordingly, the trial court did not err in denying Rosenau's motion for a directed verdict on the Gang Act count.

3. Rosenau argues that the trial court abused its discretion in denying his motion for mistrial after the prosecutor commented on Rosenau's silence during closing arguments. This claim fails.

Although closing arguments were not transcribed, the record

12

reflects that Rosenau and Pierce joined Jenkins's motion for mistrial when, according to Jenkins's counsel, the prosecutor improperly commented on the defendants' right to remain silent by talking about "Rosenau[ ] not coming forward, not calling the police, [and] not talking to the police." The trial court denied the motion but gave a curative instruction, charging the jury as follows:

> Members of the jury, the Prosecutor made some remarks during their closing right before the break we just took in which you might draw an inference that there was something required of the Defendants to say or do prior to, during, and after the incident in question. I will instruct you now, and I will instruct you again during the charge conference (sic) later on that the Defendants are not required to present anything – no evidence, no testimony, anything through themselves or through others. And, you will draw no inference, harmful to any of the Defendants, for their failure to make any comments or do anything that was stated prior to this case. No comments that they didn't make prior to, during, or after, nor their right to testify in this case. And, I've already cautioned, admonished the Prosecutor, not to pursue that line of argument going forward.

Following this instruction, Rosenau and Pierce renewed their motions for mistrial, which the trial court denied.

"A trial court has broad discretion to grant a mistrial and may

13

consider less drastic alternatives." *Jackson v. State*, 317 Ga. 139, 145 (2) (891 SE2d 878) (2023). Further, a "trial court's exercise of its discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Monroe v. State*, 315 Ga. 767, 775 (2) (884 SE2d 906) (2023) (citation and punctuation omitted).

In *Pierce*, we rejected an argument that the trial court abused its discretion in denying Pierce's motion for mistrial, "even assuming that the prosecutor's comments about Rosenau constituted improper comments about [Pierce's] silence." *Pierce*, 319 Ga. at 860 (7). And Rosenau's identical claim fails for the same reasons. As we explained in *Pierce*, "the trial court promptly rebuked the prosecutor in the jury's presence and issued a curative instruction, charging the jury that they were prohibited from drawing any negative inference from the defendants' failure to make comments or to testify." Id. And like Pierce, Rosenau "has not pointed to any evidence suggesting that the jury disregarded the court's [curative] instruction," which we presume the jurors followed. Id.

4. Rosenau asserts two claims of ineffective assistance of counsel. As explained below, both claims fail because Rosenau has not established deficient performance.

"To prevail on an ineffective-assistance-of-counsel claim, a defendant must prove both deficient performance by counsel and resulting prejudice." *Blocker*, 316 Ga. at 578 (4) (citation and punctuation omitted). "To satisfy the deficiency prong, a defendant must demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." Id. (citation and punctuation omitted). "The law recognizes a strong presumption that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption." Id. (citation and punctuation omitted). "To carry this burden, a defendant must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." Id. (citation and punctuation omitted). And "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they

15

were so patently unreasonable that no competent attorney would have followed such a course." Id. (citation and punctuation omitted). "If a defendant fails to carry his burden of proving either deficient performance or prejudice," the defendant's ineffective-assistance-of-counsel claim fails, and we need not consider the other prong of the test. Id.

(a) First, Rosenau argues that trial counsel was deficient for failing to retain a gang expert to counter the testimony of the State's gang expert. We disagree.

Trial counsel testified at the motion-for-new-trial hearing that he did not believe a gang expert was necessary because there was little evidence available pretrial that linked Rosenau to the gang, and that he sought to minimize Rosenau's connection to the case through cross-examination of the State's gang expert. Because the Gang Act charges alleged that the co-defendants committed criminal gang activity in association with the Luxiano gang, and because the evidence established that Rosenau was not a member of that gang, a reasonable attorney in this case could have opted to minimize

16

Rosenau's connection to the Luxiano gang and its crimes through cross-examination, rather than through use of a gang expert. See *Middlebrooks v. State*, 310 Ga. 748, 752 (3) (854 SE2d 503) (2021) (holding that trial counsel was not deficient for failing to retain a gang expert because "competent trial counsel could have reasonably decided to attack the gang evidence in other ways, including by cross-examining the State's witnesses who testified about gang activity"). See also *Matthews v. State*, 301 Ga. 286, 289 (2) (800 SE2d 533) (2017) (trial counsel was not deficient for failing to retain an expert and instead choosing to "use cross-examination and argument to advance a defense theory").

(b) Second, Rosenau argues that his trial attorney was constitutionally ineffective for failing to object to the testimony of an armed-robbery victim. We conclude, however, that Rosenau has not shown deficient performance.

As we recounted in *Pierce*,

the robbery victim testified that, in January 2015, he was robbed at gunpoint by two men when visiting a woman from whom he had previously purchased sex. And Lofton,

17

who testified that he was present for part of the robbery incident, identified the woman and two men who participated in the robbery as Luxiano gang members who were not on trial.

*Pierce*, 319 Ga. at 856 (5).

Rosenau does not specify the nature of the objection that he contends trial counsel should have raised to the robbery victim's testimony. But it appears from his assertions that the testimony was "totally irrelevant," was "prejudicial," and "could have confused [the jury]" that he contends trial counsel should have objected under OCGA § 24-4-402 (providing that "[e]vidence which is not relevant shall not be admissible") or OCGA § 24-4-403 (providing in relevant part that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").

Our holding in *Pierce*, however, forecloses these arguments. In that case, we held that the robbery victim's testimony was not irrelevant but rather "key, intrinsic evidence relied on by the State to establish that the Luxiano gang engaged in criminal gang

18

activity." *Pierce*, 319 Ga. at 857 (5). And we concluded that OCGA § 24-4-403 did not render the evidence inadmissible because "the trial evidence clearly established that [Pierce] had not participated in the armed robbery that was the subject of the robbery victim's testimony," and thus the risk of unfair prejudice to Pierce was "low." Id. at 857-858 (5). For the same reason the risk of unfair prejudice to Rosenau was low: "the trial evidence clearly established that [Rosenau] had not participated in the armed robbery that was the subject of the robbery victim's testimony." Id. And Rosenau has not identified any other basis for concluding that the evidence prejudiced him or confused the jury. Because an objection to the robbery victim's testimony under OCGA § 24-4-402 or OCGA § 24-4-403 would not have succeeded, Rosenau has not shown deficient performance. See *Cooper v. State*, 317 Ga. 676, 687 (2) (895 SE2d 285) (2023) ("[T]he failure to make a meritless objection is not deficient performance." (citation and punctuation omitted)).

*Judgment affirmed. All the Justices concur.*

Decided March 18, 2025.

Murder. Clayton Superior Court. Before Judge Mack.

*Manning Peace, Holly Y. Peace*, for appellant.

*Tasha M. Mosley, District Attorney, John D. Murray, Brianna W. Jordan, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, M. Catherine Norman, Assistant Attorney General*, for appellee.