NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the
# Supreme Court of Georgia

No. S26A0097
Johnnie Bryant
v.
The State

On Appeal from the Superior Court of Harris County
No. 22CR149

Decided: May 5, 2026

COLVIN, Justice.

Appellant Johnnie Bryant appeals his convictions for the malice murder of Dylan Eldridge, the aggravated assaults of James Blackmon and Willie Feggins, and related crimes arising from the same incident.[1] On appeal, Bryant contends that the evidence was insufficient as a matter of constitutional due process

---

[1] The crimes occurred on November 1, 2021. On July 19, 2022, a Harris County grand jury returned an indictment charging Bryant with malice murder (Count 1), felony murder (Count 2), aggravated assault of Eldridge (Count 3), aggravated assault of Feggins and Blackmon (Counts 4 and 5), and three counts of possession of a firearm during the commission of a felony (Counts 6, 7, and 8). Bryant was tried by a jury in June 2023 and found guilty on all counts. The trial court sentenced Bryant to life in prison without the possibility of parole for malice murder (Count 1) and purported to merge Bryant's felony murder count (Count 2) into Count 1. The trial court also entered consecutive sentences of 20 years each for Bryant's aggravated assaults of Eldridge, Feggins, and Blackmon (Counts 3, 4, and 5), and consecutive sentences of five years each for Bryant's three charges of possession of a firearm during the commission of a felony (Counts 6, 7, and 8), for a total sentence of life in prison

to support his convictions; that the State failed to disprove his defense of justification beyond a reasonable doubt; that he is entitled to a new trial on the "general grounds" provided in OCGA §§ 5-5-20 and 5-5-21; that the trial court plainly erred by admitting Eldridge's autopsy photos; that the trial court plainly erred by allowing the State to "badger" a witness for the defense during cross-examination; that he received constitutionally ineffective assistance from his trial counsel in several ways; and that the prosecutor improperly expressed his personal belief that Bryant was guilty during the State's closing argument. These arguments fail. We therefore affirm Bryant's convictions for malice murder, aggravated assault against Feggins, aggravated assault against Blackmon, and possession of a firearm during the commission of a felony. But because Bryant's conviction for aggravated assault against Eldridge should have merged into his malice murder conviction, we vacate his conviction and sentence for that offense, as explained further below. We also take this opportunity to correct a separate sentencing error regarding his felony murder conviction.

1. The evidence at trial showed the following. Bryant and his wife, Ruby Bryant, were engaged in a property dispute with Eldridge concerning four parcels of land on the east side of Sunnyside Church Road, which runs roughly north-south. At the time of Eldridge's death, Ruby owned the first property, 330 Sunnyside

_____

without parole plus 75 years. As explained in Division 8, infra, Bryant's sentences with respect to Counts 2 and 3 were in error, and we correct those errors below.

On July 10, 2023, Bryant filed a timely motion for new trial, which he later amended through new counsel. The trial court heard Bryant's motion on September 11, 2024, and denied it by written order on June 27, 2025. Bryant then filed a timely notice of appeal. His case docketed in this Court for the term beginning in December 2025 and was submitted for a decision on the briefs.

Church Road, where she had lived for more than 70 years, and where she and Bryant had lived together for more than 45 years. Through a family estate, Ruby also controlled a second property: a large, oddly shaped, and mostly undeveloped tract of land that bordered her home to the east and to the south. Trouble between the Bryants and Eldridge began in early 2020, when Eldridge purchased the third property at issue, 246 Sunnyside Church Road, a residential property to the south of Ruby and Bryant's home. And that trouble intensified when Eldridge began to harvest wood from the fourth property, 146 Sunnyside Church Road, a rectangular plot of undeveloped land that was surrounded on three sides by the land Ruby controlled through her family estate and which was only accessible by means of an unpaved path that ran through the estate's land. At the time of Eldridge's death, 146 Sunnyside Church Road was owned by Jeff Moore, but Moore had agreed to sell the land to Eldridge and had given Eldridge permission to use it prior to the closing of the sale.

(a) On November 1, 2021 — the day Eldridge was killed — Ruby contacted law enforcement to report a trespass on her property, and Deputy Donald Fowler of the Harris County Sheriff's Department was dispatched to investigate. At about 1:30 p.m., Deputy Fowler met Ruby outside her home, and she directed him to a nearby property that was later identified as 146 Sunnyside Church Road (the undeveloped plot owned by Moore). Once there, Deputy Fowler met with Deputy Christopher Staton, who had also responded to the call, and the deputies spoke to Ruby and Bryant. Their conversation was captured by the dashboard cameras on Deputy Fowler and Deputy Staton's patrol vehicles, and the two recordings were entered into evidence and played for the jury. Those videos and consistent testimony from Deputies Fowler and Stanton showed the following.

3

Upon arrival, the deputies observed an older-model blue Ford F-150 pickup truck, a trailer, a log splitter, and a stack of logs. The Bryants, believing the truck and other items were on their property, demanded that the Sheriff's Department remove them. But Deputy Fowler, who had "previous dealings" with the Bryants, did not believe the truck was on Ruby's property. And Deputy Staton used his cell phone to access a GPS-enabled version of the tax assessor's map, which showed that the truck was in fact on Moore's property (i.e., 146 Sunnyside Church Road), not Ruby's. The Bryants remained unconvinced and became visibly upset. Bryant demanded that the deputies confiscate the trespassing property and put Eldridge "in jail," and Ruby accused the deputies of refusing to help them because the Bryants were black. When the deputies explained their response had "nothing to do with white or black"; that the Sheriff's Department could not tow vehicles from private property; and that this was a civil matter, Bryant demanded the deputies call Mike Jolley, the Harris County Sheriff. The deputies declined. During the course of their conversation, Bryant lamented that the situation with Eldridge "ain't going to stop 'til ... something in the woods go on," and stated that "This gonna end today." As his frustration increased, Bryant asked, "What's gonna happen if we set here 'til he come back here, get his truck, and we have a shoot-out? What will happen then?"

At about 3:00 p.m. that afternoon, Bryant went to the Harris County Sheriff's Office to speak with Sheriff Jolley. But since Sheriff Jolley was not on-site, Chief Deputy Chris Walden invited Bryant into his office instead. There Bryant expressed that he was upset because Eldridge had taken some pecan wood from his wife's property. Bryant explained that he had spoken to the deputies about the matter but wanted a second opinion. Chief Deputy Walden pulled up the tax assessor's website on his computer, but

4

they were unable to make "a clear determination on where exactly the wood was." Chief Deputy Walden advised Bryant that this was a civil matter and encouraged him to have the land surveyed. According to Chief Deputy Walden, Bryant left at about 4:00 p.m. A few minutes later, Chief Deputy Walden "heard a dispatch call out over the 911 system" about "an individual being shot on Sunnyside Church Road."

James Blackmon testified that he and Willie Feggins were assisting Eldridge with harvesting firewood. According to Blackmon, he was hooking up a trailer to his truck when Blackmon told Eldridge that someone was coming up the driveway. Eldridge and Feggins then got in Eldridge's golf cart, and Eldridge drove the cart down the driveway, followed closely by Blackmon in Blackmon's blue pickup truck. Blackmon testified that when Eldridge encountered Bryant, Eldridge said, "it's Johnnie," to which Bryant responded, "Johnnie nothing" and "started firing out the window [of his truck] while [Eldridge and Feggins were] on the golf cart." Blackmon "thought [he] should charge him," but Bryant "turned and fired at [Blackmon's] truck," so Blackmon "jumped in [his] truck and ... hightailed it back to [Eldridge's] house." According to Blackmon, Feggins "was sitting right beside [Eldridge] when all the firing" started, but Feggins "made it ... off the golf cart and ran down in the woods."[2]

Blackmon drove "[l]ike a maniac" to Eldridge's house, where he told Eldridge's romantic partner, Tessley Wells, that Eldridge had been shot. Wells quickly got into her van and drove to find Eldridge. Blackmon then saw Feggins come up to the house from the woods. According to Blackmon, Feggins "was shaking, turning colors. I mean, it was — it was a shock." From there,

---

[2] Feggins did not testify at trial.

5

Blackmon and Feggins got in Blackmon's truck and drove south to find Eldridge but were quickly stopped by responding law enforcement officers.

The Sunnyside Community Center is located across the street from the driveway leading to 146 Sunnyside Church Road. Pamela Anderson was playing bridge at the community center with three other women when she heard about 8 to 10 gunshots. She then saw a pickup truck come "tearing out," followed shortly by a man "slumped over" on a golf cart. The man — later identified as Eldridge — "rac[ed]" up the community center and "yelled out, 'I've been shot, please help me.'" Anderson and the other women ran to the door and unlocked it. Eldridge then "pulled himself up [the] ramp [leading to the front door], ... got into [the] room ... collapsed against a refrigerator and slid down with his legs extended." He was "bleeding profusely" and became unconscious. One of the women called 911, but was disconnected, so the women also called Peter Byron Hawkins, a volunteer firefighter with EMS training who lived nearby. Hawkins responded and rendered aid until other first responders arrived and transported Eldridge to a hospital for emergency surgery.

Eldridge did not survive the surgery. Dr. Steven Atkinson, a medical examiner for the GBI who performed Eldridge's autopsy, testified that Eldridge had been shot twice: one bullet pierced the left side of Eldridge's abdomen and exited his lower back, and a second bullet struck Eldridge's left hip and exited above the base of his penis.

Sheriff Jolley was returning from a meeting in Columbus when he received a call about the shooting. After arriving at the community center and conferring with other officers, he walked to Bryant's home and asked Bryant to come outside. Bryant complied and was taken into custody. With assistance from Bryant

and Bryant's adult son, Brandon Bryant, officers also retrieved the firearm used in the shooting. During the subsequent investigation, an officer photographed a bullet hole in the driver's side door of Blackmon's truck and retrieved bullet fragments from inside the door frame.

Wells testified that Eldridge did not take a firearm with him when he left the house to harvest wood, and Blackmon testified that Eldridge did not have a firearm on him during the day. Anderson and Hawkins each testified that Eldridge did not have a firearm at the community center and that no firearm was visible in his golf cart or the immediate vicinity. And Lieutenant Kyle Senette, who responded to the shooting and rendered additional aid to Eldridge, testified that there were no firearms on or near Eldridge at the time.

(b) Bryant, Ruby, and Brandon testified for the defense. Brandon testified that Eldridge and Bryant had "bad blood" from their very first encounter. According to Brandon, after Bryant and Eldridge's initial conversation went poorly, Eldridge returned to his property and "shot off probably about 30 or 40 rounds in the air," and Eldridge continued to fire guns "randomly" for the remainder of the week until Brandon called the police. Brandon testified that the gunfire was not "target practice," but rather "some kind of intimidation." Brandon also reported that Eldridge and Bryant got into "five to 10" arguments and that Eldridge sometimes had a pistol with him during these encounters.

Bryant also testified that he had multiple arguments with Eldridge. According to Bryant, one time his great-grandchildren were playing outside with firecrackers when Eldridge came out "with a[n] AK and [a .]40 caliber pistol in his britches." Bryant reported that Eldridge "cut it off a few times, pow, pow, pow," and

7

asked the children if "they want[ed] to play[?]" On a different occasion, Eldridge "tore [Bryant's] fence down that had been up [for] 15 years.... [Eldridge] took off about three or four" feet of it. Bryant called the police, but when they responded, Eldridge hid in the bushes "laughing" and would not come out to talk to them.

Bryant testified that on the day he shot Eldridge, he went to the Sheriff's Office "to get them to tell [Eldridge] that[ ] he didn't have [a] right-of-way in there before" Eldridge purchased the property. According to Bryant, he did not leave the Sheriff's Office with an intent to kill Eldridge, and he did not know Eldridge would be on the property when he returned there. Bryant described their encounter as follows.

As Bryant drove up the driveway in his pickup truck with Ruby in the front passenger seat, Eldridge and Feggins came down it in Eldridge's golf cart. Eldridge said, "[H]ey, Mr. Johnnie," but before Bryant could reply, Eldridge continued past him. Eldridge stopped his cart about a car length behind Bryant's truck and Feggins got out and put both of his hands on the front of the cart, "where he would make sure you [could] see" them.

Then Eldridge, who was still seated in the golf cart, made a movement suggesting he was trying to retrieve a pistol from his waistband. Bryant told Ruby, "[L]ay down, he's going to shoot us," and then Bryant got out of his truck and shot at Eldridge. Eldridge then "took off" and ran into the woods, leading Bryant to think he'd "missed him."

Bryant then "heard a truck coming," "running ... hard, spinning, kicking up gravel" and "coming straight" at him. Bryant moved towards the front of his truck and fired once, hitting the side of Blackmon's truck. Bryant testified that "if [he had] stayed" where he was, he "would have been nailed good."

8

Bryant testified that even though he never saw Eldridge's gun, he believed Eldridge "was going to shoot" him. Bryant stated that Eldridge had "showed that gun to [him] about five or six times" and that Bryant "never [saw] him without" it. Bryant further testified that he shot at Blackmon because he was trying to keep Blackmon from running him over.

At trial, Ruby also testified that Bryant told her to get down on the floor of the truck because Eldridge had a gun. On cross-examination, Ruby admitted that Bryant was upset when he left the Sheriff's Office because the officers would not arrest Eldridge.

2. In two related enumerations of error, Bryant contends that the evidence was not sufficient as a matter of constitutional due process to support his convictions and that the State failed to disprove his defense of justification beyond a reasonable doubt. We do not agree.

When an appellant challenges the constitutional sufficiency of the evidence on appeal, "this Court asks whether the evidence presented at trial was sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Holloway v. State*, 320 Ga. 668, 669 (2025) (citing *Jackson v. Virginia*, 443 US 307, 319 (1979)). And when making this determination, we "view[ ] the evidence in the light most favorable to the verdicts." *Upshaw v. State*, 323 Ga. 257, 262 (2025). This view preserves the jury's role as the fact-finder by requiring us to "defer to the jury's assessment of the weight and credibility of the evidence," rather than "weigh[ing] the evidence on appeal or resolv[ing] conflicts in trial testimony" ourselves. Id. See *Jackson*, 443 US at 319.

Here, Bryant conceded that he shot and killed Eldridge and that he shot in the direction of Feggins and Blackmon but claimed

9

that he was justified in doing so. "When a defendant presents evidence that he was justified in using deadly force, the State bears the burden of disproving the defense beyond a reasonable doubt." *Allen v. State*, 322 Ga. 417, 422 (2025). "But it is the role of the jury to evaluate the evidence and, when doing so, the jury is free to reject any evidence in support of a justification defense and to accept the evidence that the defendant did not act in self-defense." Id. at 423 (internal quotation marks and citation omitted).

Though Bryant testified that he believed Eldridge was reaching for a weapon to shoot him and that Blackmon was charging Bryant with his truck, the evidence at trial was sufficient to authorize the jury to reject Bryant's claim of self-defense and instead find him guilty of the crimes charged. Video evidence of Bryant's encounter with the deputies showed that Bryant was visibly frustrated, that he said his dispute with Eldridge was "gonna end today," and that Bryant suggested there would be a "shoot-out." Bryant then went to the Sheriff's Office for a "second opinion," but when Chief Deputy Walden gave him essentially the same response as Deputy Fowler and Deputy Staton, Bryant left upset and shot Eldridge and shot at Feggins and Blackmon only a few minutes later. Blackmon testified that Bryant shot Eldridge without warning. And Blackmon, Wells, Anderson, Hawkins, and Lieutenant Senette all testified that they did not see a firearm on or near Eldridge. Additionally, Blackmon testified that he drove his truck past Bryant to escape, rather than to strike Bryant (though Blackman acknowledged contemplating charging Bryant before getting in his truck). And Bryant himself testified that Feggins made his hands visible when exiting Eldridge's golf cart such that Bryant could see Feggins was unarmed. Based on this evidence, the jury was authorized to discredit Bryant's claim of self-defense and instead credit evidence supporting the State's theory that Bryant acted without legal justification; that same evidence

also authorized the jury to infer that Bryant shot Eldridge with malice and that he shot at Feggins and Blackmon with an intent to cause violent injuries. See *Allen*, 322 Ga. at 423 (holding that the jury was authorized to reject the appellant's justification defense, where the appellant had claimed a taxi driver had attacked him for being bisexual, but other evidence showed that the killing was part of an attempted armed robbery). See also *Upshaw*, 323 Ga. at 262–63 (holding that the jury was authorized to reject the appellants' justification defense even though there was evidence that the victims had driven by the appellants' home multiple times in succession with firearms while wearing ski masks, where other evidence showed that after the victims' vehicle passed the defendants' home, the defendants went outside, waited for the vehicle to pass again and fired when it did so). Bryant's sufficiency claims therefore fail.

3. Bryant argues that he is entitled to a new trial because the jury's verdict was "contrary to evidence and the principles of justice and equity," and "decidedly and strongly against the weight of the evidence" under OCGA §§ 5-5-20 and 5-5-21, respectively. But these claims present nothing for us to review, as explained below.

In raising these grounds for a new trial — commonly known as the "general grounds" — Bryant reiterates verbatim the claims he made in his motion for new trial and asks us to consider those claims as if they were being made for the first time.[3] We do

---

[3] Bryant's principal appellate brief is virtually identical to his brief in support of his motion for new trial. And in submitting a recycled brief, Bryant failed to recast his claims for relief from the trial court below as claims of error for which he now seeks review from this Court. Bryant's request for a new trial on the general grounds is one example of this failure. Another appears at the

not consider such claims on appeal, however. See *Ward v. State*, 316 Ga. 295, 299 (2023) (explaining that "as an appellate court, we do not independently review the record" to assess general grounds claims). This is because the statutory language on which Bryant bases his request for a new trial vests the "decision to grant or refuse to grant a new trial ... solely in the trial court." Id. See OCGA § 5-5-20 (authorizing "the judge presiding" to grant a new trial on the grounds specified therein); OCGA § 5-5-21 (authorizing the "presiding judge" to grant or refuse a new trial on the grounds specified). Because we do not consider general grounds claims in the first instance and because Bryant has not asserted that the trial court failed to exercise its discretion, this enumeration presents nothing for us to review. See *Kimbro v. State*, 317 Ga. 442, 446 (2023).

4. In his next claim, Bryant argues that the trial court erred by admitting photographs of Eldridge's autopsy into evidence and by allowing the State's medical examiner to testify about those photos. Bryant contends that the photographs and testimony were inadmissible because they were "unnecessary to show any facts not already before the jury," and that the photographs (but not the testimony) were so "extremely graphic and inflammatory," that they prejudiced the jury against him. As explained below, Bryant's claim fails.

(a) When the State announced it would call Dr. Atkinson as its next witness, defense counsel stated outside the presence of the jury that he would "stipulate that [Eldridge] is deceased, and

---

conclusion of his *appellate* brief, where he inappropriately asks the Court to "grant the Appellant's Amended Motion for New Trial." This vestige of his motion-for-new-trial brief ought to have been removed, as this is "a court of review, not of first view." *Wasserman v. Franklin County*, 320 Ga. 624, 653 (2025).

that the gunshots from [his] client used that day caused his death." The State responded that it would "accept the stipulation," but asked that Dr. Atkinson nevertheless be able "to testify to everything." Defense counsel responded, "absolutely."

Dr. Atkinson then took the stand and was qualified as an expert in pathology. He testified that he performed Eldridge's autopsy and used photographs of the procedure, which the State tendered as Exhibits 3 through 30, to explain Eldridge's cause of death. Dr. Atkinson began by explaining that each autopsy is assigned a case number, and that this number is displayed on two plaques, one large and one small. Exhibit 3 shows the large plaque with Eldridge's case number on it and a smaller version of the plaque is visible in each of the other autopsy photos to establish that those photos are of the same person. Next, Dr. Atkinson used Exhibits 4, 5, and 6 to show the condition of Eldridge's body at the time it was received by his office. Exhibit 4 depicts Eldridge's face and upper chest, Exhibit 5 shows his chest and groin, and Exhibit 6 includes the lower half of his body. Because Eldridge died during surgery, the photos show the medical devices that were attached to him at the time of his death, including an endotracheal tube (Exhibit 4), EKG leads (Exhibits 4 and 5), and various catheters (Exhibits 4–6). Exhibit 5 shows a large "football shaped surgical incision" that had been packed with "vacuum dressing." And Exhibit 6 includes one catheter in Eldridge's penis and two others in the adjacent femoral regions. Dried blood is visible in each photo.

Dr. Atkinson used Exhibits 8–11, and 13–16 to show the location of Eldridge's gunshot wounds to the jury and to explain Eldridge's cause of death. Dr. Atkinson stated that one bullet pierced Eldridge in the left side of his abdomen (Exhibits 8–10) and exited from his lower back (Exhibit 16), and another bullet

13

struck him in the left hip (Exhibit 13–14) and exited above his penis (Exhibits 8, 11). Because the vacuum dressing and other signs of medical intervention were removed during his autopsy, Eldridge's intestines can be seen protruding from the incision in his abdomen (Exhibits 8–9, 11–12), and a second surgical incision is visible near his left femoral region (Exhibits 8, 11, 16). Exhibit 15[4] shows a close-up of Dr. Atkinson's "loose dissection" of the surgical incision in his femoral region. In describing the photos of Eldridge's autopsy, Dr. Atkinson explained that the gunshot that hit Eldridge's hip caused an injury to his femoral region, and that any injury to this area can "lead to significant blood loss." On this basis of his examination, Dr. Atkinson opined that Eldridge's cause of death was "gunshot wounds of [the] torso."

The State tendered, but did not publish, Exhibits 7, 12, and 17–30. Exhibit 7 depicts Eldridge's face after the medical devices had been removed. Exhibit 12 shows a close-up of the exit wound above Eldridge's penis and includes a portion of the surgical incision in his abdomen. Exhibit 17 contains another view of the exit wound in Eldridge's back. Exhibits 18–25 show some of Eldridge's organs after they were removed from his body, and Exhibits 26 and 27 show the cavity in Eldridge's abdomen created by the removal of those organs. Exhibits 28, 29, and 30 are X-rays of Eldridge's body. Though these exhibits were not published, they would have been available to the jury during its deliberations.

Although the parties seemingly agreed to stipulate both that Eldridge was deceased and that Bryant caused his death, that is not ultimately what happened. After Dr. Atkinson testified, the trial judge expressed his understanding of the parties' stipulation outside the presence of the jury, stating "a stipulation

---

[4] The prosecutor mistakenly refers to this photograph as Exhibit 16, but context makes clear that he and Dr. Atkinson are referring to Exhibit 15.

14

has been offered and been made and accepted by the defense that the deceased is Dylan Eldridge." When asked to confirm whether this was correct, defense counsel responded affirmatively. And so when the trial judge later read the jury charge, it only instructed the jury that the parties had stipulated that "[t]he State of Georgia's exhibits numbered 3 through 30 depict Dylan Eldridge."

(b) Because Bryant's trial counsel did not object to the admission of Eldridge's autopsy photos, we review Bryant's claim for plain error only. *Burns v. State*, 323 Ga. 402, 414 (2026) (applying plain error review to an unpreserved claim regarding the admissibility of autopsy photos). To establish plain error, an appellant must show a legal error "that was not affirmatively waived, ... was clear and obvious, and ... affected h[is] substantial rights, which in the ordinary case means [ ]he must demonstrate that it affected the outcome of the trial court proceedings." *Fox v. State*, 321 Ga. 411, 416 (2025) (internal punctuation marks omitted). Where an appellant makes such a showing, we have the "discretion to remedy the error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. And if "one prong of the plain error test is not satisfied, we need not address the other prongs of the test." Id.

"Under our current Evidence Code, we generally evaluate the admissibility of autopsy photographs under OCGA §§ 24-4-401, 24-4-402, and 24-4-403."[5] *Burns*, 323 Ga. at 414 (internal quotation marks and citation omitted). Thus, to show error,

---

[5] OCGA § 24-4-401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." And OCGA § 24-4-402 provides in relevant part that "[a]ll rele-

Bryant must demonstrate that the photographs and related testimony were not relevant as defined in Rule 401 and therefore inadmissible under Rule 402, or, insofar as Bryant claims that the photos were prejudicial, he must show that their "probative value is substantially outweighed by the danger of unfair prejudice" as provided in Rule 403. OCGA § 24-4-403.

To the extent Bryant argues that the photographs and Dr. Atkin's testimony were inadmissible because they were made irrelevant by his trial counsel's stipulation, Bryant misrepresents the record. As mentioned above, despite trial counsel's attempt to stipulate that the autopsy photos depicted Eldridge *and* that Bryant caused Eldridge's death, the trial court only instructed the jury that the parties had stipulated Exhibits 3 through 30 "depict

---

vant evidence shall be admissible, except ... as prescribed pursuant to ... statutory authority, applicable in the court in which the matter is pending. Evidence which is not relevant shall not be admissible." As relevant here, Rule 403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."

In Bryant's brief, his appellate counsel cites *Whitaker v. State*, 275 Ga. 521 (2002) for the rule that "[p]ost-incision autopsy photographs of a victim are admissible if necessary to show some material fact that becomes apparent only due to the autopsy." *Whitaker*, 275 Ga. at 522. We have since held that this rule, which we first announced in *Brown v. State*, 250 Ga. 862 (1983), was abrogated by the enactment of the Evidence Code in 2013. See *Venturino v. State*, 306 Ga. 391, 395 (2019).

Bryant nevertheless relies on *Whitaker* and cites it as a 2022 case, when in fact it was issued in 2002 — before the enactment of the 2013 Evidence Code. His counsel made the same error in Bryant's motion-for-new-trial brief, which the trial court identified in a footnote explaining that *Whitaker* was "no longer valid law." We require that all counsel be conscientious in their representations to the Court. Counsel are expected to exhibit the highest standards of professionalism.

16

Dylan Eldridge." With respect to Bryant's charges for malice murder and felony murder, the State was therefore still required to prove that Bryant caused Eldridge's death. See OCGA § 16-5-1(a), (c); *Melancon v. State*, 319 Ga. 741, 746 (2024). And so Eldridge's autopsy photos, which Dr. Atkinson used to explain how Eldridge had died, were therefore relevant and material evidence of causation. See OCGA §§ 16-5-1(a), 24-4-401. *Fournier v. State*, __ Ga. __, *9 (Feb. 17, 2026) (slip opinion) (rejecting the argument that an unaccepted stipulation as to the victim's cause of death rendered autopsy photographs not relevant); *Burns*, 323 Ga. at 414–15 (holding that pre- and post-incision autopsy photos were relevant because they "illustrated the medical examiner's testimony about the cause of death"). And as relevant evidence, the photographs were admissible under Rule 402 unless they were inadmissible by virtue of some other rule. See OCGA § 24-4-402.

Bryant further argues that the autopsy photos were prejudicial because they were "extremely graphic and inflammatory." To the extent Bryant's argument can be construed as a claim that the photos were inadmissible under Rule 403, Bryant fails to carry his burden to show a legal error on appeal. Bryant's brief cites the autopsy photographs generally and does not specify which of the photos he contends were graphic or make any argument about how the photos prejudiced the jury against him. While some of the photos may be fairly described as graphic, other photos to which Bryant cited, such as those showing the plaque used by the medical examiner and Eldridge's X-rays, were not graphic at all, and the photos of Eldridge's gunshot wounds that omitted his surgical incisions were not particularly gruesome. Though the photographs depicting Eldridge's surgical incisions, his organs, and his empty abdominal cavity may be considered graphic, it was clear from Dr. Atkinson's testimony that what they depicted was the result of Eldridge's surgery and the autopsy itself, rather than

17

injuries caused by Bryant. And so while these photographs may have been graphic, it is unclear — in absence from any argument by Bryant — *how* they were unfairly prejudicial to him.

As stated above, Rule 403 allows for the exclusion of prejudicial evidence, but only where the evidence's "probative value is substantially outweighed by the danger of unfair prejudice." OCGA § 24-4-403. And we have explained that the exclusion of evidence on this basis is "an extraordinary remedy that should be used only sparingly." *Albury v. State*, 314 Ga. 459, 461 (2022). Because Bryant does not specify which photographs he contends were graphic and omits any argument about how such photographs were unfairly prejudicial to him, he has failed to meet his burden on appeal to establish a legal error, and his plain error claim therefore fails.

5. Bryant further contends that the State improperly badgered Ruby during cross-examination and that the trial court erred by failing to take corrective action. Specifically, Bryant argues that the prosecutor's improper conduct prejudiced the jury against him.[6] But Bryant did not preserve this claim for ordinary appellate review by making a contemporaneous objection. See *Williams v. Harvey*, 311 Ga. 439, 442 (2021) (explaining the nature and importance of the contemporaneous objection rule). On review, we assume without deciding that plain error review applies to Bryant's unpreserved claim and conclude that Byrant has failed to show plain error.

During Ruby's cross-examination, the prosecutor asked her whether Bryant was angered by Eldridge's behavior and by the unwillingness of the Sheriff's Department to assist or understand

---

[6] Bryant does not contest the admissibility of the testimony that resulted from this alleged badgering.

him. When Ruby gave non-responsive or otherwise tangential answers, the prosecutor continued to ask her whether Bryant was angry until she finally answered affirmatively.[7] Once the prosecutor secured her response, his questioning ended.

---

[7] The exchange between Ruby and the prosecutor occurred as follows:

RUBY: Every time I would talk to [law enforcement], they would tell me this — this Dylan's [property] right here, this his.
PROSECUTOR: Okay.
RUBY: That — you know, like that. But I couldn't never explain to them that this was mine.
PROSECUTOR: They wouldn't let you explain?
RUBY: No, no, no.
PROSECUTOR: This — this made Mr. Bryant mad, right? He was upset, wasn't he, Johnnie?
RUBY: No. I'm talking about this — I'm talking about —
PROSECUTOR: No. I'm asking about your husband. He was mad about it, right, that they wouldn't listen?
RUBY: They wouldn't listen, the police.
PROSECUTOR: And your husband was mad about it, right? You can answer. He was mad, let's be honest. He was mad about it. He was mad at Dylan, right?
RUBY: But see this was my — my property.
PROSECUTOR: Okay. I understand.
RUBY: It was my property.
PROSECUTOR: I understand.
And your husband was mad that he was going on the property, right?
RUBY: And all — all this wasn't about property at the end. Dylan had done started going up to my property doing just like he wanted to do.
PROSECUTOR: Okay. And your — and your husband didn't want Dylan to do what he wanted to do, right?
RUBY: What?
PROSECUTOR: Right, he was mad? He didn't want Dylan to

19

do what he wanted to do to go on your property. He was mad about it, right?

RUBY: I — you know —

PROSECUTOR: I mean, I would like you to answer. Mr. Patterson called you to the stand, so I'd like for you to answer, Ms. Bryant. He was mad about it, right? You can tell the jury the truth. They're over here. They're ready to listen. Tell us, he was mad. And you were mad, too, because you — you were cussing and yelling at — at the sheriff's deputies because they wouldn't arrest Mr. Eldridge?

RUBY: No, no, no. The sheriff deputy — I ain't cussed at no sheriff deputy.

PROSECUTOR: Ms. Bryant, we heard the tape. You said you're tired of this sh*t, right? Isn't that what you told the deputy?

RUBY: I might of did.

PROSECUTOR: Yeah. you told him you're tired of this sh*t, right?

RUBY: Uh-huh.

PROSECUTOR: You were mad, too. You and Mr. Bryant were mad. Let's be honest. We heard it. I mean, the jury — the jury heard the tape. You said you're tired of this sh*t, right?

RUBY: Yeah. Yeah.

PROSECUTOR: Okay. Okay. Well, let's be honest. And Mr. Bryant was mad, too, because he wanted Mr. Eldridge arrested that day.

RUBY: See, see, see, every time Mr. Eldridge – when Mr. Eldridge came over there, when I would call the police, the police would tell me he had the right to shoot when he get ready, but I was — I was going through some sick. That gun, it would cause me — I had diarrhea and I had it for three years, and I've been sick, and now I got pancreatic cancer and stuff, and so.

At this point, the prosecutor asked Ruby a series of other questions covering about six pages of the transcript, but at the end of his cross-examination, he returned to the subject of Bryant's anger.

20

The trial court has a duty to "exercise reasonable control over the mode ... of interrogating witnesses ... so as to [p]rotect witnesses from undue harassment." OCGA § 24-6-611(a)(3). The Advisory Committee notes on Federal Rule of Evidence 611(a)(3), which is materially identical to OCGA § 24-6-611(a)(3), state that this rule "calls for a judgment under the particular circumstances whether interrogation tactics entail harassment or undue embarrassment. Pertinent circumstances include the importance of the testimony, the nature of the inquiry, its relevance to credibility, waste of time, and confusion." FRE 611(a)(3) (Advisory Committee Notes).[8] See also *Smith v. State*, 299 Ga. 424, 435 n.8 (2016) (noting that OCGA § 24-6-611 "mirrors Federal Rule of Evidence 611 as that rule read in 2011," and referencing the Advisory Committee notes on FRE 611). As a general matter, "[t]he extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court[, and i]t may exercise a reasonable judgment in determining when the subject is exhausted." *Alford v. United States*, 282 US 687, 694 (1931).

Here, the prosecutor asked Ruby whether Eldridge's behavior and the response of the Sheriff's Office had angered Bryant. Ruby's testimony on the subject was highly important be-

PROSECUTOR: But that day that Mr. Eldridge was shot, you agree with me that Mr. Bryant was upset that he wouldn't — that the Harris County Sheriff's Department wouldn't arrest him, fair enough? We agree on that?
RUBY: (Nods in the affirmative)
MR. JACKSON: Okay. Thank you. Thank you.

[8] We have explained that the Advisory Committee Notes to the Federal Rules of Evidence are "highly persuasive," but that they "are not binding precedent and cannot change the plain meaning of the law or rules." *Harris v. State*, 314 Ga. 238, 291 n.83 (2022).

cause it spoke directly to Bryant's state of mind immediately before he shot Eldridge. Though the prosecutor's demeanor was somewhat pointed and he repeated his question several times in various forms, this repetition was related to Ruby's unwillingness to give him a responsive answer. And because the prosecutor repeated his question until he secured an answer and stopped his questioning when he finally received one, there was no danger of wasting time or confusion. As such, Bryant has not established that the trial court erred, let alone clearly and obviously erred, in declining to exercise his discretion under Rule 611 to take corrective action with respect to the prosecutor's questioning. And because Bryant has not shown a legal error, his plain error claim fails.

6. In several related enumerations of error, Bryant contends that his trial counsel was constitutionally ineffective by (1) failing to object to the admission of the State's autopsy photographs; (2) failing to object to the State's "horrific badgering" of Ruby during cross-examination, and (3) for making a "very weak and anemic closing argument." We address each argument in turn. All fail.

(a) "To prevail on an ineffective-assistance-of-counsel claim, a defendant must show deficient performance by trial counsel and resulting prejudice." *Zayas v. State*, 319 Ga. 402, 409 (2024) (citing *Strickland v. Washington*, 466 US 668, 687 (1984)). "To satisfy the deficiency prong, a defendant must demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Rosenau v. State*, 321 Ga. 299, 307 (2025) (quotation marks and citation omitted). "The law recognizes a strong presumption that counsel performed reasonably,

and the defendant bears the burden of overcoming this presumption." Id. (quotation marks and citation omitted). "To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Cooper v. State*, 321 Ga. 349, 351 (2025) (quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Sims v. State,* 321 Ga. 627, 634 (2025) (quoting *Strickland*, 466 US at 694). "When evaluating whether an appellant has established prejudice[,] we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." *Kingdom v. State,* 321 Ga. 363, 369 (2025) (cleaned up). "If a defendant fails to establish either deficient performance or prejudice, we need not address the other part of the *Strickland* test." *Cooper*, 321 Ga. at 351–52.

(b) Bryant first argues that his trial counsel was ineffective for failing to object to the autopsy photographs. But even assuming that his counsel performed deficiently in this regard, Bryant fails to show that his counsel's decision not to object prejudiced the jury against him. As explained above, Bryant makes no argument about how the autopsy photographs were prejudicial, and it was clear from Dr. Atkinson's testimony which defects in Eldridge's body were caused by Bryant and which were instead the result of surgical intervention or the autopsy itself. The risk of the jury mistakenly attributing Eldridge's surgical and autopsy-related defects to Bryant was therefore very low. And, as noted above, the State presented strong evidence that Bryant shot Eldridge unlawfully and with malice. Bryant was visibly upset when speaking to the deputies prior to the shooting, intimated there would be a shoot-out later in the day, left Chief Deputy Walden's office angry, and shot at Eldridge, who was unarmed, in response to Eldridge's greeting. In light of the low risk of prejudice

from the autopsy photos and other, strong evidence of Bryant's guilt, Bryant has not established a reasonable probability that the result of his trial would have been different had the photos been excluded. This claim of ineffective assistance therefore fails. See *Davis v. State*, 299 Ga. 180, 190 (2016) (holding that Appellant's ineffective-assistance claim failed because the appellant had not shown a reasonable probability that an objection to the admission of autopsy photos would have changed the outcome of his trial, among other reasons).

(c) Bryant next argues that his trial counsel was ineffective for failing to object to the State's alleged badgering of Ruby during her cross-examination. But, as we explained in Division 5, the State did not badger Ruby: the prosecutor repeated his questions only until Ruby gave a responsive answer. And because an objection on witness-badgering grounds would have been meritless, Bryant's trial counsel was not ineffective for failing to object. *Reddick v. State*, 321 Ga. 73, 85 (2025) (explaining that trial counsel cannot be constitutionally deficient for failing to make a meritless objection).

(d) In his last ineffective-assistance claim, Bryant argues that his trial counsel was deficient for failing "to point to evidence presented and not presented at trial in his closing argument" and that this failure was prejudicial. We disagree.

The record shows that Bryant's trial counsel focused his closing argument on the law of self-defense and the State's burden of proof. Because Bryant's trial counsel was not asked about his strategy with respect to his closing argument during the motion-for-new trial hearing, we presume his related actions were strategic. *Reddick*, 321 Ga. at 86 ("In the absence of testimony to the contrary, counsel's actions are presumed strategic."). And "decisions regarding trial tactics and strategy may form the basis for

24

an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." Id. Here, trial counsel stressed that under the law of self-defense, a person is justified in using lethal force to defend himself if the person reasonably believes that such force is necessary to prevent imminent death and that the person does not necessarily need to see a gun for his belief to be reasonable. Counsel further explained the concept of reasonable doubt and told the jury that the State had the burden to prove beyond a reasonable doubt that Bryant did not act in self-defense. Counsel emphasized that if the jury did not find the State had met its burden, it had a duty to acquit him. Given the "wide latitude" permitted to trial counsel during closing arguments, we cannot say counsel's choice to focus on the law of self-defense and the State's burden of proof was so patently unreasonable that no competent attorney would have done the same. *Anthony v. State*, 311 Ga. 293, 298 (2021). As such, this ineffective assistance claim fails.

7. In his final claim of error, Bryant argues that the prosecutor improperly expressed his personal belief in Bryant's guilt during the State's closing argument and that the trial court erred by failing to rebuke the prosecutor. But because defense counsel did not object at trial, Bryant's claim is not preserved for ordinary appellate review, and plain error review does not apply to statements made during closing arguments. See *Brock v. State*, 319 Ga. 765, 772 (2024). This claim therefore presents nothing for us to review. See id.

8. Although Bryant does not raise any issues with his sentences on appeal, we have identified two errors and exercise our discretion to correct them. See *Hood v. State*, 315 Ga. 809, 813 (2023) (quoting *Dixon v. State*, 302 Ga. 691, 697 (2017)). First, the trial court purported to merge Bryant's felony murder conviction

(Count 2) into his malice murder conviction (Count 1), but Count 2 was instead vacated by operation of law. See *Carter v. State*, __ Ga. __, __ n.1 (Feb. 17, 2026) (citing *Hulett v. State*, 296 Ga. 49, 53 (2014)). Because this is a matter of nomenclature only and does not affect Bryant's sentence, we simply note that Count 2 was vacated by operation of law. See id. (citing *Manner v. State*, 302 Ga. 877, 890–91 (2017)). The second error is more significant, however: the trial court sentenced Bryant to 20 years in prison for the aggravated assault of Eldridge (Count 3), even though that offense merged as a matter of fact into Bryant's conviction for malice murder. Where, as here, "there is no evidence to suggest the occurrence of an aggravated assault [against the deceased victim] independent of the act which caused th[at] victim's death ... a jury's guilty verdict on the aggravated assault merges as a matter of fact with the malice murder verdict for sentencing purposes." *Hood*, 315 Ga. at 813. Accordingly, we vacate Bryant's conviction and sentence for aggravated assault against Eldridge (Count 3).[9]

*Judgment affirmed in part and vacated in part. All the Justices concur, except Warren, P. J., not participating.*

---

[9] We note that the "Sentence Summary" on Bryant's final disposition sheet states that "The Defendant is sentenced for a total of life without parole plus 75 years." (Capitalization altered). Because we vacate Bryant's conviction and 20-year sentence for aggravated assault as charged in Count 3, Bryant is now sentenced to life without the possibility of parole plus 55 years. Nothing in this opinion should be read to preclude the trial court from taking any additional actions necessary to ensure that Bryant's sentence is correctly reflected on his final disposition sheet or other related documents and that his corrected sentence is conveyed to the Department of Corrections. See OCGA § 17-10-1(f) (providing that the sentencing court has jurisdiction "to correct" any sentence "within 120 days after receipt by the sentencing court of the remittitur upon affirmance of the judgment after direct appeal").