**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0481
Lester Piercefield
v.
The State

On Appeal from the Enter Lower Court
No. 2294114

Decided: June 16, 2026

COLVIN, Justice.

Appellant Lester Piercefield appeals his convictions for malice murder and other crimes related to the shooting deaths of Jeremy Davis and Lena Wolfe, as well has his conviction for the aggravated battery of Yolanda Speller.[1] At trial, Piercefield conceded through counsel that he shot Davis, Wolfe, and Speller, but

---

[1] The crimes occurred on July 11, 2022. On September 29, 2022, a Cobb County grand jury returned an indictment charging Piercefield with the malice murder of Davis (Count 1), the malice murder of Wolfe (Count 2), felony murder of Davis (Count 3), felony murder of Wolfe (Count 4), aggravated assault against Davis (Count 5), aggravated assault against Wolfe (Count 6), aggravated assault against Speller (Count 7), aggravated battery against Speller (Count 8), and possession of firearm during the commission of a felony (Count 9). Following a jury trial from December 11 to December 14, 2023, the jury found Piercefield guilty of all charges. The court sentenced Piercefield to two terms of life in prison without the possibility of parole for the malice murder of Davis (Count 1) and the malice murder of Wolfe (Count 2), a term of twenty years in prison for aggravated battery against Speller (Count 8), and a term of

argued that he did so in self-defense. On appeal, Piercefield contends that the trial court abused its discretion by denying his general grounds claims and by denying his motion to strike a juror for cause. Piercefield also argues that he received ineffective assistance of counsel in several ways and that the cumulative effect of the trial court's errors and his counsel's ineffectiveness denied him a fair trial, even if no single error did so. After review of Piercefield's claims, we conclude that each fails, and we accordingly affirm his convictions.

1. The evidence showed the following. About three to four weeks prior to his death, Davis traveled from Detroit to Atlanta at the invitation of his girlfriend, Tisha.[2] A few days later, Tisha dropped off Davis at the apartment of her friend, Speller, whom Davis did not know. Though Tisha said she would be "right back," she never returned.

Speller — understanding that Tisha was going through a "rough patch" and believing that Davis had "nowhere to go" — allowed Davis to stay with her temporarily. Unknown to Speller, however, Davis was originally from Georgia, and the mother of his children, Kenyetta Clark, lived in the area.

At dusk on Sunday, July 10, 2022, Speller returned home

---

five years in prison for possession of a firearm during the commission of a felony (Count 9), with all counts to be served consecutively. The remaining counts (Counts 3, 4, 5, 6, and 7) were either merged or vacated by operation of law.

On December 18, 2023, Piercefield timely filed a motion for new trial, which he later amended through new counsel. After a hearing, the court denied Piercefield's motion by written order on July 25, 2025. Piercefield timely filed a notice of appeal directed to this Court. The case was docketed to the term of Court beginning in December 2025 and submitted for a decision on the briefs.

[2] Tisha did not testify at trial, and Speller did not provide her last name.

from work to find Davis waiting for her on the steps outside of her apartment. Speller let him inside, but he later left the apartment to walk to a nearby convenience store.

While out, Davis found his way to a party at an apartment complex, where he bumped into his old friends, Piercefield and Jerimiah Tidwell, at some point between midnight and 1:00 a.m. The three had gone to school together and had known each other for about 15 years. According to Tidwell, Davis was "happy" and "surprised" to see Piercefield, whom Davis had not seen "in years." Together, they drank and smoked. The group briefly parted ways before meeting back up at a 24-hour diner. Tidwell arrived there with his girlfriend, a male friend, and Lena Wolfe. Davis and Piercefield traveled to the diner together in Piercefield's mother's white Honda Accord. Tidwell had brought Wolfe to the diner with him in hopes of setting up a date between Wolfe and Piercefield. While in or around the diner, the group continued to smoke and drink and were in good spirits.

After eating at the diner, the group parted ways, and Piercefield drove Davis and Wolfe to Speller's apartment. Upon arrival, Davis asked Speller if Wolfe and Piercefield — whom Speller did not know — could come in for a minute so that Wolfe could use the restroom. Davis and Piercefield chatted with Speller in the living room for a few minutes, and then Davis and Piercefield went back to check on Wolfe. Only Davis returned, leaving Wolfe and Piercefield in the rear of the apartment together for about 15 to 20 minutes. Speller told Davis that she "[did]n't like people [being] in [her] house that long that [she] [did]n't know," and, at Speller's insistence, Davis went back and got them. Wolfe and Piercefield then left the apartment.

At some point thereafter, Davis got in contact with Clark (the mother of his children), and he asked Speller if Clark could

3

bring his children by. Clark came over at about 3:30 a.m., after finishing a shift as a driver for a food delivery service, but she did not bring the children. Upon her arrival, Clark joined Davis in Davis's bedroom. According to Clark, Davis was only wearing shorts and slides. Since he did not have a shirt on, Clark could see that Davis had a gun with a black handle tucked into his waistband. After talking for a few minutes, Clark decided to shower in the bathroom directly across the hallway from Davis's bedroom. Davis entered the bathroom shortly thereafter, undressed, and joined her in the shower, where they were "intimate."

While they were in the bathroom, Speller heard a knock at the door. When Speller answered it, she saw Wolfe, who asked to see Davis. Speller called out to Davis, saying "this is getting to be too much now. It's too many people." Davis met Wolfe at the door and told Speller that it would only be a few minutes. Wolfe entered. But then Piercefield entered too. Then Speller's dog started barking.

As Speller walked to the back of the apartment to attend to her dog, she heard a gunshot. As she came back towards Davis's bedroom, she saw Davis lying in his bed, shot. Wolfe was standing near the doorway. Wolfe looked at Speller, and Speller asked, "What's going on?" Piercefield then shot at Speller twice, missing her once and striking her once above her temple. Speller fell, but she watched as Wolfe looked directly at Piercefield, apologized to him for something, and then Piercefield shot her in the head.

As Speller laid on the floor, Piercefield stopped by her and said, "B***h, if you're not dead, I'm going to come back and kill you[,] or I will send someone to kill you." Piercefield then walked back and forth past Speller twice before exiting the apartment.

4

Clark remained in the bathroom directly across from Davis's bedroom while the shooting occurred, apparently without Piercefield's knowledge. Clark testified that when Davis initially left the bathroom, she was "kind of eavesdropping." She put her ear to the door and heard a woman's voice, a man's voice, and Davis's voice. She heard Davis say that "his baby mom is here and that's not yours." She described the conversation as "normal" in tone. As Clark backed away from the door to get ready "to go out there," she heard a gunshot. She continued to back away and got in the bathtub for cover when she heard a second gunshot. Clark then saw a bullet come through the bathroom door and heard more shots.

After a few minutes, Clark left the bathroom. She saw Wolfe lying on the floor and Davis on the bed. According to Speller, Clark helped Speller look for her phone to call 911. Clark testified that Speller was already on the phone with 911 when Clark first heard her. The call came in at 4:22 a.m., and officers arrived a few minutes later. Speller was taken to the hospital, where she remained for more than a week. After spending time there, she returned to Boston, where her family lived.

As a result of the shooting, Speller lost vision in her left eye. An autopsy revealed that Wolfe had been shot once behind her ear, likely killing her almost instantly. Davis had multiple gunshot wounds from which the medical examiner opined that he had most likely been shot four times. He was hit once in the leg and once in the chest, striking his heart. One bullet struck him on the rear of his shoulder, exited from the top of his shoulder and hit him again in the head. And a fourth bullet entered through the palm of his right hand, making it unlikely, in the view of the medical examiner, that Davis was holding anything in that hand when he was shot. The medical examiner further noted that the

5

bullets that struck Davis had upward trajectories and that "the most reasonable" explanation for the nature of his wounds was that Davis was "lying down or heavily reclined" when he was shot, which matched the position in which he was found.

Review of surveillance footage from Speller's apartment complex quickly led officers to identify a white Honda Accord registered to Piercefield's mother, Dione Core. At trial, Core testified that she had lent her car to her son, Piercefield, on the night of the shooting, that she called him at 3:00 a.m. when he had not returned, and that she woke up when he came home at about 5:40 a.m. When she drove her car to work on Monday morning, she noted that her revolver, a Taurus .38 Special, was missing from its usual place in her center console. After she returned home, she asked Piercefield about it, and he said he had placed her gun underneath her pillow. She later hid it from him in her house. Officers obtained a search warrant for Core's residence in Dallas, which they executed on Tuesday night. Core cooperated with the officers and directed them to the location of her revolver.

Subsequent review of Flock cameras and cell site location data corroborated testimony concerning Piercefield's location before, during, and after the shooting. The investigation also revealed that two guns were used in the shooting: the Taurus revolver described above and another revolver or derringer that was never recovered, as explained further in Division 4(d), below.

Piercefield did not testify at trial, but he argued through counsel that Davis had taken Piercefield's mother's gun from her car at some point in the evening and that Piercefield had returned to Speller's apartment to retrieve the stolen firearm. According to Piercefield, this led to a fight in which Piercefield was forced to defend himself.

2. In his first enumeration of error, Piercefield contends

6

that the trial court abused its discretion by denying his motion for new trial on the "general grounds" set forth in OCGA §§ 5-5-20 and 5-5-21 because the jury's verdict was contrary to the weight of evidence under OCGA § 5-5-20, and decidedly and strongly against the weight of the evidence under OCGA § 5-5-21.

When a defendant properly raises a general grounds claim in a timely motion for new trial, "the trial judge must exercise a broad discretion to sit as a 'thirteenth juror.'" *White v. State*, 319 Ga. 367, 374 (2024) (citation omitted). "The merits of the trial court's decision on the general grounds are not subject to our review," however, because "the decision to grant a new trial on the general grounds is vested solely in the trial court." Id. (brackets and citation omitted): see also *Bryant v. State*, S26A0097, slip op. at 6 (Ga. May 5, 2026) (2026 WL 1216239) (explaining that "the statutory language on which" the appellant based "his request for new trial vests the decision to grant or refuse to grant a new trial ... solely in the trial court" (quotation marks and citation omitted)). A review of the trial court's order denying Piercefield's motion for new trial shows that it expressly weighed the evidence and considered the credibility of witnesses when "exercis[ing] its discretion ... as the 'thirteen juror,'" and concluded that the verdict was neither against the weight of evidence, nor did it offend the principles of justice and equity. Because the trial court exercised its discretion using the appropriate standard of review, Piercefield's general grounds claim presents nothing for us to review on appeal. See *White*, 319 Ga. at 374.

3. In his next enumeration of error, Piercefield argues that the trial court abused its discretion when denying Piercefield's motion to strike Juror No. 24 for cause. After review, we conclude that the trial court's decision was within its discretion, as explained below.

7

(a) During voir dire, the trial judge asked each potential juror the questions required by OCGA § 15-12-164, received appropriate responses, and qualified them as competent to serve as jurors.[3] Though voir dire was not transcribed, the court reporter recorded the proceedings related to Piercefield's motion to strike Juror No. 24, and it is clear from context that during voir dire Juror No. 24 informed the parties she was employed as a secretary for Chief Judge Brendan Murphy of the Cobb County Magistrate Court. The transcript shows that the trial judge asked Juror No. 24 to remain behind after excusing the other members of her panel from the courtroom and instructed her not to "do any research on this case."

After the trial judge gave Juror No. 24 this instruction and

---

[3] OCGA § 15-12-164(a) provides in pertinent part:

(a) On voir dire examination in a felony trial, the jurors shall be asked the following questions:

(1) "Have you, for any reason, formed and expressed any opinion in regard to the guilt or innocence of the accused?" If the juror answers in the negative, the question in paragraph (2) of this subsection shall be propounded to him;

(2) "Have you any prejudice or bias resting on your mind either for or against the accused?" If the juror answers in the negative, the question in paragraph (3) of this subsection shall be propounded to him;

(3) "Is your mind perfectly impartial between the state and the accused?" If the juror answers this question in the affirmative, he shall be adjudged and held to be a competent juror in all cases where the authorized penalty for the offense does not involve the life of the accused[.]

OCGA § 15-12-164(a)(1)–(3).

excused her from the courtroom, Piercefield moved to strike her for cause. Piercefield's counsel argued that as a secretary for a judge in Cobb County's magistrate court (the class of court in which Piercefield's initial probable cause hearing was conducted), she may have been privy to non-public information about the case. Though Piercefield's counsel appeared to acknowledge that Juror No. 24 had testified that she "d[id not] remember" anything about Piercefield's case, counsel argued that the trial might "refresh her recollection." In response, the State argued that striking Juror No. 24 for cause would be inappropriate because she responded, "no," when asked whether she had heard anything about the case. The trial court denied Piercefield's motion, stating that it had "safeguarded the case by ... giving her the instructions ahead of time about research" and that Juror No. 24 said, "she hadn't heard of the defendant or anything about the case earlier." Piercefield did not use a peremptory strike to remove Juror No. 24, and she was ultimately seated on the jury.

During the motion-for-new-trial hearing, Piercefield's trial counsel confirmed that though, as Chief Magistrate, Judge Murphy typically assigned other magistrate judges to handle probable cause and bond hearings, his secretary usually coordinated the other magistrate judges' calendars, and so she may have handled administrative tasks related to Piercefield's case. Trial counsel further testified that he always asked jurors if they recognize the name of the defendant and if they "remember anything about the case" and that he asked Juror No. 24 about her ability to be fair and impartial. Trial counsel explained that though he raised the issue of Juror No. 24's competence in his motion to strike, he did not use one of his peremptory strikes on her because he thought her knowledge of the legal system "might ... [have] been an assistance to us in raising a self-defense argument" and so he "wasn't that concerned with her being on the jury."

In its order denying Piercefield's motion for new trial, the trial court found that it "observed Juror No. 24's specific answers to questions and [that] Juror No. 24 did not express a fixed and definite opinion of [Piercefield]'s guilt or innocence." The trial court concluded that Piercefield had "not demonstrated that Juror No. 24 ... was unqualified to serve."

(b) "Whether to strike a juror for cause lies within the sound discretion of the trial judge, and the trial court's exercise of that discretion will not be set aside absent a manifest abuse of discretion." *Malcolm v. State*, S26A0057, slip op. at 6 (Ga. Apr. 21, 2026) (2026 WL 1072663) (quoting *Jones v. State*, 314 Ga. 605, 614 (2022) (punctuation omitted)). "[T]he law presumes that potential jurors are impartial, and the burden of proving partiality is on the party seeking to have the juror disqualified." *Terrell v. State*, 313 Ga. 120, 124–25 (2022). Moreover,

> [t]o excuse for cause a selected juror in a criminal case on the statutory ground that her ability to be fair and impartial is substantially impaired, a challenger must show that the juror holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will not be able to set it aside and decide the case on the evidence or the court's charge on the evidence.

*Malcolm*, slip op. at 6 (quoting *McCabe v. State*, 319 Ga. 275, 285 (2024)). To establish prejudice on appeal, a defendant must show that "the challenged juror[ ] who served on his or her twelve-person jury was unqualified." *Terrell*, 313 Ga. at 125.

Here, Juror No. 24 answered each of the statutory fitness questions appropriately and testified that she had no fa-

miliarity with Piercefield or his previous criminal proceedings before the magistrate court. The trial court found this testimony credible. Piercefield presents no evidence to the contrary on appeal, and no law to support his claim that an employee of the magistrate court is subject to automatic removal upon request from the defendant.[4] In absence of such evidence or caselaw, Piercefield has not established that Juror No. 24 was unqualified, and thus has not met his burden on appeal. Accordingly, Piercefield has not established that the trial court abused its discretion in declining to strike Juror No. 24 for cause. See *Malcolm*, slip op. at 7 (holding that the trial court did not abuse its discretion by failing to remove a juror for cause where the juror had ongoing contact with the district attorney's office in an unrelated matter, but testified that she could be fair and impartial).

4. Piercefield next argues that his trial counsel was constitutionally ineffective in three ways. Piercefield contends that (a) his counsel failed to adequately investigate Piercefield's history of mental health issues and pursue a verdict of not guilty by reason of insanity; (b) his counsel failed to request a jury charge on voluntary manslaughter; and (c) his counsel failed to object to testimony commenting on Piercefield's right to remain silent. We

---

[4] Piercefield cites *Beam v. State*, 260 Ga. 784 (1991), for the proposition that judicial officers and employees thereof are subject to automatic removal from the jury upon request from the defendant, but *Beam* concerned an employee of the district attorney's office that prosecuted the very case on which the employee sat as a juror, not employees of the magistrate court. *Beam* is therefore distinguishable. See *Jackson v. State*, 202 Ga. App. 223, 223 (1991) (holding that *Beam* did not apply and the trial court did not abuse its discretion in failing to strike a juror for cause where the challenged juror was a part-time magistrate judge because "[a] magistrate is not a full-time employee of the office of the district attorney, but is, instead, a member of the neutral and independent judicial branch of government").

consider each claim in turn and determine that each fails.

We begin with the law applicable to ineffective-assistance claims. As we have explained, "[t]o prevail on an ineffective-assistance-of-counsel claim, a defendant must show deficient performance by trial counsel and resulting prejudice." *Zayas v. State*, 319 Ga. 402, 409 (2024) (citing *Strickland v. Washington*, 466 US 668, 687 (1984)). To establish that his trial counsel performed deficiently, "a defendant must demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Rosenau v. State*, 321 Ga. 299, 307 (2025). "The law recognizes a strong presumption that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption." Id. (quotation marks and citation omitted). Overcoming this presumption requires "a defendant [to] show that no reasonable lawyer would have done what his lawyer did[ ] or would have failed to do what his lawyer did not." Id. "To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Cooper v. State*, 321 Ga. 349, 351 (2025) (quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Sims v. State*, 321 Ga. 627, 634 (2025) (quoting *Strickland*, 466 US at 694). "When evaluating whether an appellant has established prejudice[,] we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." *Kingdom v. State*, 321 Ga. 363, 369 (2025) (cleaned up). Because an appellant must establish both his counsel's deficient performance and prejudice resulting therefrom, "[i]f a defendant fails to establish either deficient performance or prejudice, we need not address the other part of the *Strickland* test." *Cooper*, 321 Ga. at 351–52.

(a) In his first ineffective assistance claim, Piercefield argues that his counsel failed to adequately investigate Piercefield's mental health, failed to request an evaluation of Piercefield's criminal responsibility at the time of the crimes, and failed to pursue a verdict of not guilty by reason of insanity. After reviewing the facts and the scant evidence adduced at Piercefield's motion-for-new-trial hearing, we conclude that Piercefield has not established that he was prejudiced by his counsel's decision not to obtain an evaluation of Piercefield's criminal responsibility at the time of the crime and that Piercefield's counsel was not deficient for declining to pursue a verdict of not guilty by reason of insanity.

(i) In March 23, 2023, Piercefield's trial counsel filed an ex parte petition for a confidential psychiatric evaluation of Piercefield. In his petition, counsel wrote that "Counsel has reason to believe that Defendant is suffering from some mental disease, injury, or congenital deficiency which renders hi[m] presently not competent to stand trial. In addition, counsel has reason to believe the Defendant's mental state at the time of the offense will likely be a significant issue at trial." The trial court entered an order granting Piercefield's motion the same day. In this order, the trial court directed "a qualified psychologist with the Department of Behavioral Health and Developmental Disabilities" ("DBHDD") to conduct an examination of Piercefield to determine his competency to stand trial and his degree of criminal responsibility at the time of the alleged crimes.

Though the trial court ordered DBHDD to conduct Piercefield's evaluation, DBHDD had a "significant backlog," and the parties agreed to employ an independent psychologist instead. Pursuant to this agreement, the trial court entered a consent order appointing Dr. Holly Kaufman to perform Piercefield's evaluation.

Dr. Kaufman evaluated Piercefield's competency to stand trial on September 14, 2023, and prepared a report with her findings dated September 29, 2023. In that report, Dr. Kaufman noted that Piercefield had a ninth-grade education and passed his GED exam on the second try. According to the report, Piercefield had previously been diagnosed with schizophrenia, ADHD, bipolar mania, anxiety, posttraumatic stress disorder, and depression. Piercefield had been hospitalized "at least ten" times, for as long as 20 days, and on most of these occasions, he was hospitalized involuntarily. Piercefield had been prescribed medications classified as antidepressants, anticonvulsants, mood stabilizers, and antipsychotics. Piercefield reported that he was prescribed Zyprexa (an antipsychotic) at the time of his evaluation, and he noted that "it works but he still hears voices." And Dr. Kaufman described Piercefield's "description of the voices" as "consistent with genuine psychosis." Piercefield also told Dr. Kaufman that "he discontinued his medications 'all the time.'"

Dr. Kaufman observed in her report that Piercefield was "alert, calm, polite, and cooperative with the evaluation" and that his "thought process was logical and goal-directed." She noted "no evidence of delusional beliefs," though Piercefield reported "experiencing auditory hallucinations 'every day.'" Piercefield "did not appear to be listening to or distracted by anything [Dr. Kaufman] could not hear" during the evaluation, and there was no evidence that he was experiencing visual hallucinations, ideas of reference (i.e., "making illogical inferences about normal, everyday occurrences"), or mania.

In response to Dr. Kaufman's questions, Piercefield demonstrated a basic understanding of the nature and object of the legal proceedings against him. Where he required education on a topic, he was able to learn and retain this information. Based on this

14

and other information, Dr. Kaufman concluded that Piercefield was competent to stand trial. She did not evaluate Piercefield's criminal responsibility at the time of the alleged crimes. Dr. Kaufman noted, however, that Piercefield "has a history of medication nonadherence" and so "his competency to stand trial may require reevaluation" if "he discontinue[s] his medication and exhibit[s] a decompensation in his current functioning."

During the motion for new trial hearing, Piercefield's trial counsel testified that he was aware of Piercefield's mental health issues and the option of pursuing a verdict of not guilty by reason of insanity, but "thought we had a better chance" of obtaining a verdict of "not guilty by self-defense." Trial counsel explained that the evidence did not suggest that Piercefield was acting "under a delusion" at the time of the shooting. Trial counsel further testified that he "never had issues communicating with" Piercefield and that Piercefield wrote notes for him explaining Piercefield's "side of the story." Trial counsel noted only one occasion that gave him pause: once, when trial counsel was "getting up to leave a visit, ... [Piercefield] said something about radios listening to his thoughts or something, and he pointed up to the ceiling, like the jail had some way to listen to thoughts." "But besides that," trial counsel testified, there was nothing else that stood "out as a concern." Based on his understanding of the evidence and his experience with Piercefield, trial counsel chose to prioritize a defense of justification rather than pursue a verdict of not guilty by reason of insanity.

Piercefield did not present any evidence at the motion-for-new-trial hearing attempting to establish that he lacked criminal responsibility by virtue of insanity at the time of the crimes.

In its order denying Piercefield's motion for new trial, the

trial court found credible trial counsel's testimony that he investigated Piercefield's mental health, that he considered raising a "mental health defense" (i.e., seeking a verdict of not guilty by reason of insanity), that he decided that pursuing a defense of justification was the better strategy, and that this choice was informed in part by his view that Piercefield did not appear to be under any kind of delusion at the time of the shooting. Based on these findings, the trial court concluded that trial counsel was not deficient for failing to further investigate or raise a mental health defense.

(ii) We assume without deciding that his counsel was deficient for failing to further investigate Piercefield's mental health by retaining an expert to evaluate Piercefield's criminal responsibility at the time of the crimes. But because Piercefield presented no evidence at his motion-for-new-trial hearing of what such an evaluation would have shown, his contention that his counsel's performance prejudiced him at trial is speculative. And because Piercefield's trial counsel testified that, based on his review of the evidence, Piercefield was not acting "under a delusion" at the time of the crime, Piercefield cannot establish a reasonable probability that the outcome of his trial would have been different without evidence to the contrary. Accordingly, even assuming his counsel's performance was deficient for failing to further investigate Piercefield's mental health by obtaining an evaluation of Piercefield's criminal responsibility at the time of the crime, Piercefield has not established the prejudice necessary to support an ineffective-assistance claim. See *Suggs v. State*, 310 Ga. 762, 768 (2021) ("Appellant has not suggested, much less shown, what further investigation would have revealed or how it would have helped his defense. Thus, even if counsel had conducted an inadequate investigation, Appellant has failed to prove the required

16

prejudice."); *Lane v. State*, 299 Ga. 791, 795–96 (2016) ("[The appellant] presents no evidence, or even assertion, as to what further investigation or preparation might have produced that would have made a difference in the outcome of his trial. Consequently, [the appellant] fails to show ineffective assistance of trial counsel on this ground.").

(iii) Piercefield's related claim that his counsel was ineffective for declining to seek a verdict of not guilty by reason of insanity fails because Piercefield has not established on appeal that his counsel's decision to forgo pursuing such a verdict was objectively unreasonable. Here, trial counsel obtained an evaluation of Piercefield's competency to stand trial, and it was determined that he was competent. Trial counsel also spoke with Piercefield's mother regarding Piercefield's history of mental health issues, reviewed the evidence, and determined — based on this investigation — that Piercefield did not appear to be under any kind of delusion at the time of the incident. Trial counsel testified at the motion-for-new-trial hearing that he decided not to raise the issue of Piercefield's mental health as an issue of strategy for this reason, and the trial court found trial counsel's statements credible. Based on this record, we cannot say that trial counsel's decision to pursue a verdict of not guilty rather than a verdict of not guilty by reason of insanity was objectively unreasonable. See *Whitus v. State*, 287 Ga. 801, 804 (2010) (holding that trial counsel's conduct was not objectively unreasonable where counsel made a strategic decision to pursue a verdict of not guilty rather than seek a verdict of not guilty by reason of insanity based on weak evidence that the defendant lacked criminal responsibility at the time of the crime). And because we cannot say that no reasonable attorney would have done what Piercefield's counsel did, Piercefield's claim fails.

17

(b) Piercefield next faults his counsel for failing to request a jury charge on voluntary manslaughter. Piercefield contends that his counsel's decision to request only an instruction on self-defense rather than requesting instructions on both self-defense and voluntary manslaughter was constitutionally ineffective. Though Piercefield recognizes that pursuing an "all-or-nothing" defense is typically a matter of trial strategy — and therefore not the type of behavior that usually constitutes deficient performance — Piercefield nevertheless contends that his counsel's decision was deficient and prejudicial under the circumstances here, where Piercefield's maximum possible sentence for murder was life in prison without the possibility of parole[5] and his maximum possible sentence for voluntary manslaughter was 20 years in prison. See *Douglas v. State*, 321 Ga. 739, 749 (2025) ("Decisions about which defenses to present and which jury charges to request are classic matters of trial strategy, and pursuit of an all-or-nothing defense is generally a permissible strategy."); OCGA § 16-5-1(e)(1); OCGA § 16-5-2(b) ("A person who commits the offense of voluntary manslaughter, upon conviction thereof, shall be punished by imprisonment for not less than one nor more than 20 years.").

During the motion-for-new-trial hearing, trial counsel testified that his choice to request only an instruction on self-defense was a matter of "strategy." As trial counsel explained, "I don't

---

[5] Though, as a general matter, the maximum possible sentence for murder is death, the State did not announce that it was seeking the death penalty, and so Piercefield's maximum possible sentence for murder was life in prison without the possibility of parole. See OCGA § 16-5-1(e)(1) ("A person convicted of the offense of murder shall be punished by death, by imprisonment for life without parole, or by imprisonment for life."); Unified Appeal Procedure, Rule II(C)(1) (requiring the prosecuting attorney to state whether he or she intends to seek the death penalty at a conference before arraignment).

18

want a jury to see I'm cutting my own feet out from under me[.] I'm saying, hey, we're not guilty, ... we had a right to defend ourself." Accordingly, trial counsel put "all [his] weight behind" a self-defense strategy and "felt that ... putting" on evidence or argument that Piercefield "may be under some compulsion or was angry that the victim had stolen his firearm would take way from the fact that he actually was afraid." In its order, the trial court credited trial counsel's testimony "that he strategically decided not to request a lesser included charge on voluntary manslaughter" and concluded that his performance was therefore not deficient.

On appeal, Piercefield does not point to any evidence of the provocation he contends would have supported a voluntary manslaughter charge and our review of the evidence does not reveal any basis for Piercefield's claim. See OCGA § 16-5-2(a) (providing that the defendant must "act[ ] solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person"). As such, we cannot say his counsel's choice to pursue only a theory of self-defense was objectively unreasonable. See *Vann v. State*, 311 Ga. 301, 305 (2021) (holding that trial counsel was not deficient for failing to pursue a defense of voluntary manslaughter where counsel concluded that the defense "was either unavailable or weak because the evidence did not show, or only questionably showed that [the appellant] had been seriously provoked" and that voluntary manslaughter would have been "inconsistent" with the appellant's defense). See also *Douglas*, 321 Ga. at 749–50. And because Piercefield has failed to establish that his counsel's performance was deficient in this regard, his claim fails.

(c) In his last ineffective assistance claim, Piercefield contends that his trial counsel failed to object to testimony elicited by

the State commenting on Piercefield's right to remain silent. Because Piercefield's trial counsel made a strategic decision not to object to this testimony and this decision was not objectively unreasonable, Piercefield's claim fails, as explained below.

(i) At trial, the State's firearms expert testified that she examined three bullets. The expert determined that the bullet retrieved from Davis's head was fired from the Taurus .38 Special Revolver that was recovered from Piercefield's mother's home. The expert further determined that the remaining two bullets retrieved from the floor of the crime scene and Davis's shoulder, respectively, were not fired from the Taurus, but that both had been fired from the same unidentified pistol or derringer.

Detective Tristan McCulloch testified that the Taurus was retrieved from Piercefield's mother's house but that the second firearm was never located. When testifying on direct examination about these firearms, the following exchange occurred:

> PROSECUTOR: Now that we know that there were two guns, I mean, were there any revolvers or derringers found inside that residence?
>
> DET. McCULLOCH: No, there were not.
>
> PROSECUTOR: Okay. And so what conclusions did you draw?
>
> DET. McCULLOCH. That we got — we recovered one of the firearms from Ms. Core's residence, and the other one is — *well, Mr. Piercefield knows.*

(Emphasis added). Piercefield's trial counsel did not object to this testimony, and the State's examination of Detective McCulloch continued.

During the motion-for-new-trial hearing, Piercefield's trial counsel testified that, as a general matter, he makes objections "strategically," and "oftentimes" chooses not to object where he believes that an objection would "put a spotlight on the evidence that [he] do[es]n't want the jury" to consider. Accordingly, "sometimes [he] just decide[s] it's not the best thing to object." Trial counsel testified that he did not object to Detective McCulloch's remark because he viewed the testimony as consistent with the defense's theory of the case. Specifically, trial counsel testified that he "didn't object because it was our theory of the case that the second firearm was Mr. Piercefield's mother's that was in the car and he had taken it back to his mother's house when he left the apartment complex to return it to her." Trial counsel further testified that "it was part of our theory of the case of exactly what happened, so it was not damaging to my theory of what I was arguing." The trial court found these statements credible in its order denying Piercefield's motion and concluded that trial counsel was not ineffective.

(ii) Even assuming, without deciding, that Detective McCulloch's testimony indirectly referenced Piercefield's right to remain silent, it did so by means of an unstated implication that was consistent with the defense's own theory of the case. Under these circumstances, we cannot say that counsel's decision not to object was so patently unreasonable that no competent attorney would have done the same. Where there is little if any danger of prejudice from the objectionable question or testimony, but there may be some danger of prejudice associated with objecting, a trial counsel's strategic decision to forgo a meritorious objection can be reasonable. See *Stapleton v. State*, 323 Ga. 380, 387 (2026) (holding that trial counsel was not deficient for failing to make a meritorious objection where the objectionable question regarding the

21

defendant's prior conviction elicited testimony that was consistent with the defendant's prior testimony and objecting to the question may have caused the jurors to question the defendant's credibility). Because Piercefield has not established his counsel's performance was deficient in this regard, his ineffective assistance claim fails.

5. Finally, Piercefield argues that the cumulative effect of the trial court's errors and his trial counsel's deficiencies deprived him of a fair trial, even if no single error did so. "To establish cumulative error," an appellant "must show that 'at least two errors were committed in the course of the trial[,] and considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied [him] a fundamentally fair trial.'" *Ash v. State*, 312 Ga. 771, 796 (2021) (quoting *State v. Lane*, 308 Ga. 10, 21 (2020)) (cleaned up). But in resolving Piercefield's claims above, we have assumed only a single deficiency by Piercefield's trial counsel: that he failed to pursue a mental health defense. And because we assumed only a single instance of trial counsel deficiency, Piercefield's cumulative error claim fails. Id. at 797.

*Judgment affirmed. All the Justices concur.*